1    MARC STEVEN APPLBAM, ESQ. SBN # 222511
     MIDWAY LAW FIRM APC
2    4275 Executive Square Suite 200
     La Jolla, CA 92037
3    marc@midwaylawfirm.com

4    Attorneys for Plaintiff
     ASIA BROADBAND, INC. ("AABB")

5

6

7                        **UNITED STATES DISTRICT COURT**

8                    **IN THE CENTRAL DISTRICT OF CALIFORNIA**

9

10

11   ASIA BROADBAND, INC. ("AABB"),        Case No.:

12            Plaintiff,                    **COMPLAINT**

13   vs.

14   VIRTU FINANCIAL INC. GTS              **JURY DEMAND**
     SECURITIES, G1 EXECUTION
15   SERVICES, DOES 1-50, inclusive, and
     DOE Business Entities 1-50, inclusive,
16
              Defendants.
17

18

19        Plaintiff, **ASIA BROADBAND, INC. ("AABB")** complains against all named and

20   unnamed Defendants, alleges as follows:

21                                    **PARTIES**

22        1.      Plaintiff ASIA **BROADBAND, INC ("AABB")** is a corporation formed

     under the laws of Nevada doing substantial business in this district. Plaintiff **Asia**

     **Broadband, Inc. ("AABB")** is a resource company engaged in digital asset development,

     precious metals operations, and technology-based financial services. During the Class

     Period, **AABB's** common stock traded publicly under the ticker symbol "**AABB**"   on the

     OTC Markets and was damaged by Defendants' manipulative trading practices, which

     artificially suppressed AABB's stock price, impaired its ability to raise

capital, distorted market valuation, and materially hindered its access to public equity financing.

2.     Defendant **VIRTU FINANCIAL INC. ("NITE")** is a corporation formed under the laws of New York with a principal place of business in New York. **NITE** (Knight Capital / Virtu Financial) is one of the largest OTC market-making entities in the United States. NITE is registered with the SEC as a broker-dealer and maintains operations in New York and New Jersey. NITE places and executes trades for both its customers and for its own proprietary trading accounts. During the Class Period, NITE dominated AABB's Level-2 order book, frequently controlling the highest percentage of visible bid and ask depth, and was a primary executor of the spoofing, bid layering, wash trading, and naked short selling described herein.

3.     Defendant **GTS SECURITIES ("GTSM")** is a corporation formed under the laws of New York with a principal place of business in New York.

4.     Defendant **G1 EXECUTION SERVICES, LLC** is a corporation formed under the laws of Illinois with a principal place of business in New York.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this action pursuant to 28 USCS § 1331 and 15 USCS § 78a because this action arises under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, including Rule 10b-5 and Sections 9(a)(2) and 9(e).

6.     Venue is proper in this district pursuant to 15 USCS § 78aa as the Defendants transact substantial business and/or events constituting the violations alleged herein occurred in this district.

## STATEMENT OF FACTS

7.     Plaintiff is a Nevada corporation that owns and trades securities on national securities exchanges in this district.

8.      Defendants engaged in a pattern and practice of market manipulation tactics designed to artificially influence the price of securities owned or traded by plaintiff.

9.    Defendants engaged in "spoofing" by placing orders to buy or sell securities with the intent to cancel the orders before execution, thereby creating false impressions about supply and demand.

10.    Defendants engaged in "bid layering" by placing multiple limit orders at different price levels away from the inside market, creating the false appearance of market depth and liquidity.

11.    Defendants engaged in "wash trading" by simultaneously or nearly simultaneously buying and selling the same securities, creating the false appearance of market activity while resulting in no change in beneficial ownership.

12.    Defendants colluded with other market participants to coordinate trading activities designed to manipulate securities prices.

13.    Defendant engaged in "naked short selling" by selling securities short without first borrowing or arranging to borrow the securities, and subsequently failing to deliver the securities when required.

14.    Defendant engaged in "quote stuffing" by placing and quickly canceling large numbers of orders in rapid succession, overwhelming market systems and creating artificial volatility.

15.    Defendant engaged in "micro stuffing" by placing and quickly canceling small orders in rapid succession to create false impressions of market activity.

16.    Defendant's manipulative activities were conducted through the use of interstate commerce and national securities exchanges.

17.    Defendant's manipulative activities were conducted with the intent to artificially influence securities prices and to induce other market participants, including plaintiff, to trade based on false market information.

18.    As a direct and proximate result of defendant's manipulative activities, plaintiff purchased and/or sold securities at artificially inflated and/or depressed prices.

19.    Plaintiff has suffered substantial financial losses as a result of defendant's manipulative activities.

20.     Plaintiff Asia Broadband, Inc. ("AABB" or "Plaintiff"), by and through its undersigned counsel, brings this action under Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other similarly situated persons who sold AABB common stock between February 1, 2021 and December 31, 2025 and were damaged thereby.

21.     Plaintiff alleges the following based upon personal knowledge as to its own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things: review and analysis of Level-2 trading video archives; contemporaneous trade tape data; market microstructure analysis; public disclosures; academic research relating to spoofing, wash trading, and market-maker manipulation; and statistical evidence of manipulative order-flow behavior by Defendants GTSM and NITE during the Class Period. Plaintiff's investigation is ongoing and substantial additional evidentiary support is expected to exist for the allegations herein after a reasonable opportunity for discovery.

## I.     PRELIMINARY STATEMENT

22.     This federal securities action arises from Defendants' persistent, coordinated, and illegal manipulation of the market for AABB common stock throughout the Class Period. For nearly five years, Defendants **GTSM** (GTS Securities) and **VIRTU/NITE** (NITE/Knight/Virtu) engaged in a continuous pattern of spoofing, wash trading, bid layering, collusion, naked short selling, and artificial order-book manipulation, all designed to suppress the price of AABB stock and distort the true appearance of supply, demand, and market depth..

23.     Defendants—two of the largest OTC market makers in the United States—systematically injected false signals into the Level-2 order book through non-bona fide bids and offers, fleeting quote flashes, multi-layered bid walls, wash-trade clusters, and synchronized algorithmic rotations across both sides of the market. These deceptive practices artificially depressed AABB's share price and materially impaired the

Company's financing ability, valuation, market reputation, liquidity, and access to capital markets, including uplisting and institutional participation.

24.     As documented in extensive Level-2 video recordings and contemporaneous trade-tape analysis, Defendants repeatedly placed large visible orders that they had no intention of executing—frequently flashing, adjusting, withdrawing, or relocating them within fractions of a second. These spoofing and layering events were executed with high-frequency precision, often in lockstep between GTSM and NITE, and consistently served to cap upward price momentum, fade buying interest, and induce downward pressure through artificial depth and false liquidity signals.

## II.     SUMMARY OF THE FRAUD
### A. AABB BUSINESS BACKGROUND

25.     Founded in 1996, Asia Broadband, Inc. ("AABB") is a resource company focused on precious metals production, digital asset development, and technology-backed financial services. AABB is the issuer and operator of the AABB Gold ("AABBG") digital token and maintains mining, refining, and metals-based operations in Mexico and Asia. Throughout the Class Period, AABB relied on public capital markets to support its growth initiatives, including mine expansion, digital asset development, and strategic acquisitions.

26.     AABB's common stock traded publicly on the OTC Markets under the ticker "AABB". Due to the Company's development-stage posture and industry sector, fair market valuation and access to equity financing were directly dependent on transparent, lawful market conditions. Defendants' manipulative activities materially distorted these conditions, depressing AABB's market capitalization, impairing access to capital, and damaging the Company's ability to execute its business strategy.

**UNDER FEDERAL SECURITIES REGULATIONS, DEFENDANTS HAVE A DUTY, AS MARKET "GATEKEEPERS," TO MONITOR ORDER FLOW AND TO REFRAIN FROM FACILITATING OR EXECUTING ILLEGAL TRADES**

27.     Investors in OTC securities cannot independently place orders directly into

the marketplace; they must route their trades through market-making broker-dealers such as GTSM and NITE. As registered broker-dealers, Defendants serve as the principal "gatekeepers" to market integrity, controlling execution quality, order routing, and the appearance of supply and demand in the Level-2 order book.

28.    Regulators—including the SEC, FINRA, and the CFTC—require market makers to monitor order flow for manipulative activity and to prevent the placement, acceptance, or facilitation of illegal trades, including spoofing, wash trading, layering, and naked short selling. These obligations apply both to trades executed for customers and to trades placed for Defendants' own proprietary accounts.

29.    Specifically, the **SEC's** Market Access Rule, 17 C.F.R. § 240.15c3-5, requires broker-dealers to establish and maintain systems reasonably designed to prevent manipulative or improper trading activity, including erroneous orders, algorithmic abuses, and illicit high-frequency activity.

30.    FINRA Rule 3110 imposes additional supervisory responsibilities, mandating that broker-dealers maintain systems capable of detecting and preventing manipulative or fraudulent activity, including layered orders, wash-trade cycles, and repeated non-bona fide quote placement.

31.    As detailed below, regulators have previously warned Defendants that their systems, controls, and high-frequency quoting practices were vulnerable to abuse and had, in fact, been used to facilitate unlawful trading activity. Despite these warnings, Defendants continued to engage in— and benefit from—precisely the forms of manipulation prohibited by federal law.

## III.    FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

32.    Beginning in early June 2025, GTSM repeatedly engaged in dual-side spoofing, flashing large bid and ask sizes without execution intent. In the June 23, 2025 recording, GTSM's bid at $0.0306 rapidly jumped from 154,000 to 224,000 shares within seconds—yet no corresponding trades executed against this liquidity. Simultaneously, NITE adjusted its ask levels in rapid succession (e.g., $0.0332 during frames 94–145s),

repeatedly blocking upward movement while pulling its quote the moment buyers approached.

33.    During June and July 2025—a period marked by increased retail interest, expanded corporate disclosures by AABB, and heightened trading volume—Defendants GTSM and NITE executed a concentrated campaign of manipulative trading designed to suppress the price of AABB common stock. Across multiple Level-2 video recordings, Defendants' activity in this period represents one of the clearest and most egregious clusters of spoofing, bid layering, wash trading, and collusive order-book behavior in the Class Period.

34.    Across hundreds of sessions, Defendants repeatedly inundated the Level-2 order book with large bursts of non-bona fide orders—often flashing hundreds of thousands of shares at multiple price levels—only to cancel them when the price approached or buying pressure emerged. These "Spoofing Episodes" occurred throughout the Class Period, frequently multiple times per hour.

35.    Defendants placed these spoofing and layered orders either (a) for their own proprietary benefit, or (b) while knowingly or recklessly facilitating manipulative trades from affiliated accounts or coordinated traders. Their high-frequency systems allowed real-time alterations of displayed depth, enabling Defendants to exploit microsecond reaction times unavailable to ordinary investors.

36.    Defendants intensified these tactics into July 2025. In the July 2025 video, GTSM repeatedly adjusted its bid at $0.0262, increasing its displayed size from 16,000 to 50,000 shares during volume builds at approximately 56,000 shares—only to pull back entirely once the upward pressure subsided. NITE simultaneously layered asks in the $0.0294–$0.0300 range, padding resistance levels and preventing natural price discovery.

37.    These June–July 2025 sequences illustrate a coordinated strategy: Defendants repeatedly built multi-level spoofing structures on both sides of the book, synchronized their layer rotations, injected artificial selling and resistance behavior through wash trades, and reversed upward momentum during critical periods of natural demand.

38.     This June–July 2025 cluster a broader pattern repeating across the Class Period: Defendants achieved short-term and long-term control of the Level-2 environment through spoofing, wash trading, and bid layering, thereby suppressing AABB's market price for their own financial advantage.

39.     In December 2025, Defendants GTSM and NITE engaged in another intense cluster of spoofing, bid layering, and coordinated wash trading, as captured in multiple pre-market and intraday Level-2 videos. This period reflects one of the most blatant and synchronized sequences of manipulation in the Class Period, marked by rapid quote flashing, artificial depth creation, and dual-side suppression tactics.

40.     In the December 2025 pre-market video, GTSM repeatedly flashed large bid sizes—most notably increasing its displayed interest at $0.0131 from 10,000 shares to over 100,000 shares within seconds—despite no corresponding execution interest. These bid flashes appeared moments before clusters of micro-sell prints (e.g., 23-share, 47-share, and 100-share lots at $0.0139), suggesting coordinated efforts to create the appearance of steady selling pressure.

41.     During this same period, GTSM engaged in ask-side spoofing by flashing 20,000-share walls at $0.0147 and $0.0200, which evaporated immediately upon the approach of buying activity. The fleeting nature of these orders confirms they existed only to cap upward momentum during a period where AABB otherwise exhibited natural buying strength.

42.     GTSM acted in close coordination with NITE throughout this pre-market sequence. GTSM frequently layered bids in the $0.0131–$0.0134 band, while also flashing asks in the $0.0144–$0.0148 range, mirroring NITE's rotations. These synchronized adjustments created a persistent artificial ceiling, preventing price elevation beyond short-term micro-bounces.

43.     The December 2025 intraday video reveals an even more aggressive pattern. In the opening minutes, GTSM's bid at $0.0136 spikes from 100,000 to 200,000 shares despite minimal genuine sell-side pressure, and yet executes almost no volume at those

-8-

levels. This confirms the orders were non-genuine and intended solely to manipulate perceived depth.

44.    As a result of Defendants' manipulative conduct during December 2025, AABB experienced sharp, repeated intraday reversals and failed breakouts that were inconsistent with normal market dynamics. These effects directly harmed AABB by:

- depressing market price during periods of natural demand,
- distorting the perceived risk profile and liquidity of AABB stock,
- suppressing valuation critical to financing negotiations, and
- impairing the Company's ability to raise capital under fair, non-manipulated conditions.

45.    The December 2025 sequences further illustrate the persistent pattern of collusion between GTSM and NITE, the use of advanced HFT-style quoting tactics to manipulate price, and the ongoing deployment of spoofing and wash trading to distort the market for AABB common stock.

46.    A third major cluster of manipulative trading occurred between July 2025 and late December 2025, during which GTSM and NITE intensified their coordinated suppression of AABB's market price. This period includes the July 2025 Level-2 video, the December 2025 pre-market footage, and the December 2025 intraday session—each demonstrating the same hallmark patterns of quote manipulation, layering, and artificial selling pressure.

47.    In the July 2025 video, NITE repeatedly manipulated the lower bid band at $0.0262, oscillating its displayed size from 16,000 to 50,000 shares during modest volume surges (~56,000 shares). These adjustments were not tied to legitimate supply; rather, they were timed perfectly to fade upward momentum and induce micro-reversals. GTSM simultaneously reinforced these suppressive tactics by layering asks in the $0.0294–$0.0300 range, padding overhead resistance and preventing the price from breaking above natural buying pressure.

48.    The pattern resurfaced—more aggressively—in the December 2025 pre-

market session, where GTSM flashed large bids at $0.0131 (including bursts to 100,000
+ shares) only to withdraw them instantly as the price approached. These spoofed bids
were paired with synchronous ask flashes at $0.0144–$0.0148, creating a tightly
controlled artificial channel that forced price stagnation and discouraged legitimate
counterparties from trading into the manipulated book.

49.    NITE played an active role in maintaining these channels by repeatedly
layering bid stacks in the $0.0131–$0.0135 band and ask walls in the $0.0144–$0.0150
band. These layers collapsed or vanished as soon as the market probed for execution—
confirming they served no economic purpose other than to signal false depth.

50.    The December 2025 intraday video revealed even clearer evidence of
coordinated manipulation. GTSM dramatically increased its displayed bid at $0.0136
from 100,000 to 200,000 shares, despite minimal actual sell volume at that level. These
bids evaporated seconds later, demonstrating they were spoofed solely to absorb
upward pressure and redirect momentum downward.

51.    Simultaneously, GTSM orchestrated a series of rapid-fire ask-layer
flashes—each in the 50,000 to 100,000 share range—strategically timed to coincide with
buying attempts. These flashes artificially capped the price and were withdrawn at the
moment buying interest subsided. This "probe-and-fade" technique is a common spoofing
hallmark used by high-frequency traders to mislead investors about market strength.

52.    Tape analysis from this July–December period further reveals a high
incidence of wash trades, including multiple examples of identical share quantities
executing at identical timestamps with no intervening third-party prints. These synthetic
prints created manufactured volume, amplified the illusion of persistent selling pressure,
and contributed to Defendants' scheme to depress AABB's price.

53.    Despite positive Company developments during this period—including
sustained digital-asset development, operational updates from mining activity, and
increased retail investor engagement—the market repeatedly failed to reflect organic
demand. Instead, AABB experienced forced reversals, failed breakouts, and prolonged

price suppression directly correlated with bursts of spoofing and wash trading by GTSM and NITE.

54.    The combined July–December 2025 cluster demonstrates a consistent pattern: Defendants systematically manipulated both sides of the book, deployed non-bona fide orders, and coordinated wash trades to distort the true buying and selling interest in AABB. These practices materially harmed AABB by suppressing valuation, reducing liquidity, impairing financing opportunities, and deterring natural market participants.

55.    Viewed collectively, the patterns in July 2025, December 2025 pre-market, and December 2025 intraday recordings confirm Defendants' sustained and intentional manipulation of AABB's market price, with effects that extended far beyond isolated sessions and permeated the entire trading period.

56.    In reality, Defendants' malfeasance dates back to 2021 and Plaintiff has the historical data to back it up.  In subsequent pleadings Plaintiff is prepared to show long-term quantitative data that exhibits what is explained in detail below.  Defendants' engaged in a structured, coordinated effort to collude and manipulate the Plaintiff's stock.  This was a multi-year structural shorting/suppression scheme conducted by the same small group of market makers handling the most volume of the trading.

### Statement 1: Early June 2025 GTSM Dual-Side Spoofing

57.    Beginning in early June 2025, GTSM repeatedly engaged in dual-side spoofing, flashing large bid and ask sizes without execution intent. In the June 23, 2025 recording [Exhibit 1], NITE's bid at $0.0306 rapidly jumped from 154,000 to 224,000 shares within seconds—yet no corresponding execution occurred against this liquidity. Simultaneously, NITE adjusted its ask levels in rapid succession (e.g., $0.0332 during frames 94–145s), repeatedly blocking upward movement while pulling its quote the moment buyers approached.

### Statement 2: June and July 2025 Coordinated Suppression by GTSM and NITE

58.    During June and July 2025—a period marked by increased retail interest,

expanded corporate disclosures by AABB, and heightened trading volume—Defendants GTSM and NITE executed a concentrated campaign of manipulative trading designed to suppress the price of AABB common stock. Across multiple Level-2 video recordings [Exhibits 2, 3, 4, 5, 6, 7], Defendants' activity in this period represents one of the clearest and most egregious clusters of spoofing, bid layering, wash trading, and collusive order-book behavior in the Class Period.

**Statement 3: July to December 2025 Intensified Manipulation Cluster**

59.    A third major cluster of manipulative trading occurred between July 2025 and late December 2025, during which GTSM and NITE intensified their coordinated suppression of AABB's market price. This period includes the July 2025 Level-2 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16]—each demonstrating the same hallmark patterns of quote manipulation, layering, and artificial selling pressure.

**Statement 4: Non-Bona Fide Orders and Spoofing Episodes Across Sessions**

60.    Across hundreds of sessions, Defendants repeatedly inundated the Level-2 order book with large bursts of non-bona fide orders—often flashing hundreds of thousands of shares at multiple price levels—only to cancel them when the price approached or buying pressure emerged. These "Spoofing Episodes" occurred throughout the Class Period, frequently multiple times per hour, as documented in the June to December 2025 recordings [Exhibits 1–20].

**Statement 5: Defendants' Proprietary or Facilitated Manipulative Trades**

61.    Defendants placed these spoofing and layered orders either (a) for their own proprietary benefit, or (b) while knowingly or recklessly facilitating manipulative trades from affiliated accounts or coordinated traders. Their high-frequency systems allowed real-time alterations of displayed depth, enabling Defendants to exploit microsecond reaction times unavailable to ordinary investors, as seen in the coordinated quote behaviors across the reviewed sessions [Exhibits 1–20].

1 **Statement 6: Intensified Tactics in July 2025**

2      62.    Defendants intensified these tactics into July 2025. In the July 2025 video [Exhibit

3 7], GTSM repeatedly adjusted its bid at $0.0262, increasing its displayed size from 16,000

4 to 50,000 shares during volume builds at approximately 56,000 shares—only to pull back

5 entirely once the upward pressure subsided. NITE simultaneously layered asks in the $0.0294–

6 $0.0300 range, padding overhead resistance and preventing natural price discovery.

7 **Statement 7: Coordinated Strategy in June–July 2025**

8      63.    These June–July 2025 sequences illustrate a coordinated strategy: Defendants

9 repeatedly built multi-level spoofing structures on both sides of the book, synchronized their layer

10 rotations, injected artificial selling and resistance behavior through wash trades, and reversed

11 upward momentum during critical periods of natural demand, as evidenced in the analyzed

12 recordings [Exhibits 2–7].

13 **Statement 8: December 2025 Intensified Spoofing and Layering by**

14 **GTSM and NITE**

15      64.    In December 2025, Defendants GTSM and NITE engaged in another intense

16 cluster of spoofing, bid layering, and coordinated wash trading, as captured in multiple pre-

17 market and intraday Level-2 videos [Exhibits 15, 16, 19]. This period reflects one of the most

18 blatant and synchronized sequences of manipulation in the Class Period, marked by rapid quote

19 flashing, artificial depth creation, and dual-side suppression tactics.

20 **Statement 9: December 2025 Pre-Market Bid Spoofing by GTSM**

21      65.In the December 2025 pre-market video [Exhibit 15], GTSM repeatedly flashed

22

23 large bids at $0.0131 (including bursts to 100,000+ shares) only to withdraw them instantly as the

24 price approached. These spoofed bids were paired with synchronous ask flashes at $0.0144–

25 $0.0148, creating a tightly controlled artificial channel that forced price stagnation and

26 discouraged legitimate counterparties from trading into the manipulated book.

27 **Statement 10: GTSM Coordination with NITE in December 2025 Pre-**

28 **Market**

66.    GTSM acted in close coordination with NITE throughout this pre-market sequence [Exhibit 15]. GTSM frequently layered bids in the $0.0131–$0.0134 band, while also flashing asks in the $0.0144–$0.0148 range, mirroring NITE's rotations. These synchronized adjustments created a persistent artificial ceiling, preventing price elevation beyond short-term micro-bounces.

### Statement 11: December 2025 Intraday Bid Spoofing by GTSM

67.    The December 2025 intraday video [Exhibit 16] reveals an even more aggressive pattern. In the opening minutes, GTSM dramatically increased its displayed bid at $0.0136 from 100,000 to 200,000 shares, despite minimal actual execution at that level. These bids executed almost no volume and were withdrawn seconds later, demonstrating they were spoofed solely to absorb upward pressure and redirect momentum downward.

### Statement 12: GTSM Ask Spoofing in December 2025 Intraday

68.    Simultaneously in the December 2025 intraday session [Exhibit 16], GTSM orchestrated a series of rapid-fire ask-layer flashes—each in the 50,000 to 100,000 share range—strategically timed to coincide with buying attempts. These flashes artificially capped the price and were withdrawn at the moment buying interest subsided. This "probe-and-fade" technique is a common spoofing hallmark used by high-frequency traders to mislead investors about market strength.

### Statement 13: Wash Trades in July–December 2025

69.    Tape analysis from this July–December period further reveals a high incidence of wash trades, including multiple examples of identical share quantities executing at identical timestamps with no intervening third-party prints. These synthetic prints created manufactured volume, amplified the illusion of persistent selling pressure, and contributed to Defendants' scheme to depress AABB's price, as documented in the analyzed sessions [Exhibits 7, 15, 16].

### Statement 14: Impact of Manipulation on AABB During July–December 2025

70.    Despite positive Company developments during this period—including sustained digital-asset development, operational updates from mining activity, and increased retail investor

engagement—the market repeatedly failed to reflect organic demand. Instead, AABB experienced sharp, repeated intraday reversals and failed breakouts that were inconsistent with normal market dynamics, as shown in the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16].

### Statement 15: Harm to AABB from Defendants' Conduct

71.    These manipulative practices directly harmed AABB by: depressing market price during periods of natural demand, distorting the perceived risk profile and liquidity of AABB stock, suppressing valuation critical to financing negotiations, and impairing the Company's ability to raise capital under fair, non-manipulated conditions, as evidenced across the June to December 2025 recordings [Exhibits 1–20].

### Statement 16: Consistent Pattern in December 2025 Sessions

72.    The December 2025 sequences further illustrate the persistent pattern of collusion between GTSM and NITE, the use of advanced HFT-style quoting tactics to manipulate price, and the ongoing deployment of spoofing and wash trading to distort the market for AABB common stock, as captured in the pre-market and intraday sessions [Exhibits 15, 16].

### Statement 17: Combined July–December 2025 Cluster of Manipulation

73.    The combined July–December 2025 cluster demonstrates a consistent pattern:

Defendants systematically manipulated both sides of the book, deployed non-bona fide orders, and coordinated wash trades to distort the true buying and selling interest in AABB. These practices materially harmed AABB by suppressing valuation, reducing liquidity, impairing financing opportunities, and deterring natural market participants, as documented in the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16].

### Statement 18: Collective Impact Across Sessions

74.    Viewed collectively, the patterns in July 2025, December 2025 pre-market, and December 2025 intraday recordings confirm Defendants' sustained and intentional manipulation of AABB's market price, with effects that extended far beyond isolated sessions and permeated

the entire trading period, as evidenced in the analyzed exhibits [Exhibits 7, 15, 16].

## CLAIMS FOR RELIEF

### COUNT I - Violation of Rule 10b-5

### (Against All Defendants)

75.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 74 as if fully set forth herein.

76.    Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of Securities and Exchange Commission rules.    *Thompson v. Paul*, 547 F.3d 1055 (9th Cir. 2008). Rule 10b-5 implements Section 10(b) and makes it unlawful to employ any device, scheme, or artifice to defraud, to make any untrue statement of a material fact or to omit to state a material fact necessary to make statements not misleading, or to engage in any act, practice, or course of business which operates as fraud or deceit upon any person, in connection with the purchase or sale of any security.

77.    Nevada has enacted securities laws under NRS 90.570(2) and (3) that address securities fraud in state enforcement actions. *Sec'y of State v. Tretiak*, 117 Nev. 299, 22 P.3d 1134 (2001). The Nevada Uniform Securities Act must be applied and construed to effectuate its general purpose to make uniform the law with respect to securities among states enacting it and to coordinate the interpretation and administration with related federal laws and regulations. *Sec'y of State v. Tretiak*, 117 Nev. 299, 22 P.3d 1134 (2001).

78.    Rule 10b-5, promulgated under the Securities Exchange Act of 1934, establishes the elements of securities fraud in federal law. These elements generally include: (1) a material misrepresentation or omission, (2) made with scienter (intent or knowledge of wrongdoing), (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff relied, and (5) that caused the plaintiff's damages.

79.    Plaintiff alleges the following elements (1) a material misrepresentation or

omission, (2) made with scienter (intent or knowledge of wrongdoing), (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff relied, and (5) that caused the plaintiff's damages.

80.    Plaintiff alleges that Defendants allege that, directly or indirectly, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a national securities exchange, used or employed manipulative and deceptive devices or contrivances in connection with the purchase or sale of securities. s.

81.    Defendants engaged in spoofing, bid layering, wash trading, collusion, naked short selling, quote stuffing, and micro stuffing, all of which constitute manipulative and deceptive devices or contrivances. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, electronic trading networks, and the facilities of national securities markets.

82.    Defendant acted with scienter, that is, with intent to deceive, manipulate, or defraud.

83.    Defendant's manipulative activities were designed to create false impressions of market activity and to artificially influence securities prices.

84.    Defendant's manipulative activities were in connection with the purchase or sale of securities.

85.    Defendant's manipulative activities affected securities that were purchased or sold by plaintiff.

86.    Plaintiff reasonably relied on the integrity of the market when making investment decisions.

87.    Plaintiff would not have purchased or sold securities at the prices it did had it known of defendant's manipulative activities.

88.    Plaintiff suffered economic loss as a result of defendant's manipulative activities.

89.    Plaintiff purchased securities at artificially inflated prices and/**or sold securities** at artificially depressed prices, resulting in financial losses.

90.    Defendant's manipulative activities were designed to create false impressions of market activity and to artificially influence securities prices, as the coordinated spoofing, layering, quote stuffing, tape painting, and sell dominance created deceptive depth, volume, and momentum signals across the analyzed sessions [Exhibits 1–20].

91.    Defendant's manipulative activities were in connection with the purchase or sale of securities, as the tactics directly distorted the order book and execution environment during active trading periods in the June to December 2025 recordings [Exhibits 1–20].

92.    Defendant's manipulative activities affected securities that were purchased or sold by plaintiff, as the artificial pinning and resets impacted all trades in the reviewed AABB sessions [Exhibits 1–20].

93.    Plaintiff reasonably relied on the integrity of the market when making investment decisions, as the manipulated Level II and tape presented false liquidity and demand signals that appeared as normal market conditions in the analyzed exhibits [Exhibits 1–20].

94.    Plaintiff would not have purchased or sold securities at the prices it did had it known of defendant's manipulative activities, as the spoofed depth, layered resistance, and synthetic sells created distorted pricing not reflective of true supply/demand in the sessions [Exhibits 1–20].

95.    Plaintiff suffered economic loss as a result of defendant's manipulative activities, as trading occurred at prices suppressed by the documented tactics across the period [Exhibits 1–20].

96.    Plaintiff purchased securities at artificially inflated prices and/or sold securities at artificially depressed prices, resulting in financial losses, as the persistent downward bias and failed breakouts despite buy volume led to unfavorable executions in

the June to December 2025 data [Exhibits 1–20].

**UNDER FEDERAL SECURITIES REGULATIONS, DEFENDANTS HAVE A DUTY, AS MARKET "GATEKEEPERS," TO MONITOR ORDER FLOW AND TO REFRAIN FROM FACILITATING OR EXECUTING ILLEGAL TRADES**

97.    Investors in OTC securities cannot independently place orders directly into the marketplace; they must route their trades through market-making broker-dealers such as GTSM and NITE. As registered broker-dealers, Defendants serve as the principal "gatekeepers" to market integrity, controlling execution quality, order routing, and the appearance of supply and demand in the Level-2 order book.

98.    Regulators—including the SEC, FINRA, and the CFTC—require market makers to monitor order flow for manipulative activity and to prevent the placement, acceptance, or facilitation of illegal trades, including spoofing, wash trading, layering, and naked short selling. These obligations apply both to trades executed for customers and to trades placed for Defendants' own proprietary accounts.

99.    Specifically, the **SEC's** Market Access Rule, 17 C.F.R. § 240.15c3-5, requires broker-dealers to establish and maintain systems reasonably designed to prevent manipulative or improper trading activity, including erroneous orders, algorithmic abuses, and illicit high-frequency activity.

100.    FINRA Rule 3110 imposes additional supervisory responsibilities, mandating that broker-dealers maintain systems capable of detecting and preventing manipulative or fraudulent activity, including layered orders, wash-trade cycles, and repeated non-bona fide quote placement.

101.    As detailed below, regulators have previously warned Defendants that their systems, controls, and high-frequency quoting practices were vulnerable to abuse and had, in fact, been used to facilitate unlawful trading activity. Despite these warnings, Defendants continued to engage in— and benefit from—precisely the forms of manipulation prohibited by federal law.

102.    Plaintiff's economic loss was caused by defendant's manipulative activities

as Defendant's manipulative activities directly caused artificial price movements in the affected securities, which directly caused plaintiff's financial losses.

103.   Plaintiff alleges that Defendants conduct is the proximate cause of its damages.

## COUNT II - Violation of Section 9(a)(2) of the Securities Exchange Act

### (Against All Defendants)

104.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 103 as if fully set forth herein.

105.   The elements of a claim under Section 9(a)(2) are as follows:

A series of transactions in a security creating actual or apparent active trading in that security, or raising or depressing the price of that security.

The transactions were carried out with scienter (intent or knowledge of wrongdoing).

The purpose of the transactions was to induce the purchase or sale of the security by others.

The plaintiff relied on the transactions.

The transactions affected the plaintiff's purchase or selling price.

106.   Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected a series of transactions in securities registered on a national securities exchange.

107.   Defendant engaged in spoofing, bid layering, wash trading, and other manipulative tactics involving securities registered on national securities exchanges.

108.   Plaintiff alleges the following transactions that are attached and incorporated as **Exhibit A**.

109.   Defendant's transactions created actual or apparent active trading in the securities.

110.   Defendant's manipulative activities created false impressions of market

1    activity and liquidity.

2    111.    Plaintiff alleges that defendant's transactions as reflected in Exhibit A

3    raised or depressed the price of the securities.

4    112.    Defendant's manipulative activities caused artificial price movements in the

5    affected securities.

6    113.    At all times material, Plaintiff alleges that the factual allegations as stated

7    herein is the proximate cause of its damages as stated herein,

8    114.    Defendant's transactions were conducted for the purpose of inducing others

9    to purchase or sell the securities.

10    115.    Defendant's manipulative activities were designed to induce other market

11    participants, including plaintiff, to trade based on false market information.

12    116.    Defendant acted willfully and intentionally in conducting these

13    manipulative transactions.

14    117.    Defendant knowingly and intentionally engaged in the manipulative

15    activities described herein.

16    118.    Defendant, directly or indirectly, by the use of the mails or any means or

17    instrumentality of interstate commerce, or of any facility of any national securities

18    exchange, effected a series of transactions in securities registered on a national securities

19    exchange, as the coordinated manipulative order placements and executions occurred

20    through NASD/OTC facilities interconnected with interstate systems across the analyzed

21    sessions [Exhibits 1–20].

22    119.    Defendant engaged in spoofing, bid layering, wash trading, and other

23    manipulative tactics involving securities registered on national securities exchanges, as

24    repeatedly documented in the rapid non-bona fide order placements, layered stacks,

25    matched clusters, and micro-lot probing in the trade tapes and Level II videos [Exhibits 1–

26    20].

27    120.    Plaintiff alleges the following transactions that are attached and

28    incorporated as Exhibit A [Exhibits 1–20].

121.    Defendant's transactions created actual or apparent active trading in the securities, as the artificial volume from wash trades and spoofed depth generated misleading signals of activity in the reviewed sessions [Exhibits 1–20].

122.    Defendant's manipulative activities created false impressions of market activity and liquidity, as the illusory order book and synthetic prints distorted perceived demand/supply across the June to December 2025 recordings [Exhibits 1–20].

123.    Plaintiff alleges that defendant's transactions as reflected in Exhibit A raised or depressed the price of the securities, as the coordinated dumps and layered resistance caused artificial resets and pinning despite buy pressure [Exhibits 1–20].

124.    Defendant's manipulative activities caused artificial price movements in the affected securities, as evidenced by the failed breakouts and engineered fades in the analyzed exhibits [Exhibits 1–20].

125.    At all times material, Plaintiff alleges that the factual allegations as stated herein is the proximate cause of its damages as stated herein, as the manipulative tactics directly led to suppressed valuation and unfavorable trading conditions in the sessions [Exhibits 1–20].

126.    Defendant's transactions were conducted for the purpose of inducing others to purchase or sell the securities, as the deceptive quoting and volume signals were designed to mislead market participants into trading at manipulated levels [Exhibits 1–20].

127.    Defendant's manipulative activities were designed to induce other market participants, including plaintiff, to trade based on false market information, as the spoofed depth and layered walls created illusions prompting reactions in the reviewed data [Exhibits 1–20].

128.    Defendant acted willfully and intentionally in conducting these manipulative transactions, as the systematic and recurring nature of the tactics across months indicates deliberate execution [Exhibits 1–20].

129.    Defendant knowingly and intentionally engaged in the manipulative activities described herein, as the coordinated synchronization and precise timing in the

Level II videos and tapes demonstrate purposeful manipulation [Exhibits 1–20].

## COUNT III - Violation of Section 9(e) of the Securities Exchange Act

### (Against All Defendants)

130.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 129 as if fully set forth herein.

131.   Defendant violated Section 9 of the Securities Exchange Act through the manipulative activities described herein.

132.   Defendant engaged in spoofing, bid layering, wash trading, and other manipulative tactics prohibited by Section 9.

133.   Plaintiff alleges that the transactions listed on **Exhibit B** violated Section 9(e) of the Securities Act

134.   Plaintiff purchased or sold securities at prices affected by defendant's manipulative activities.

135.   Plaintiff traded securities whose prices were artificially inflated or depressed as a result of defendant's manipulative activities.

136.   Plaintiff suffered damages as a result of defendant's manipulative activities.

137.   Plaintiff incurred financial losses by trading securities at artificially inflated or depressed prices.

138.   Plaintiff alleges that Defendant's violations of Section 9 caused plaintiff's damages.

139.   Plaintiff's financial losses were directly caused by the artificial price movements resulting from defendant's manipulative activities.

140.   Defendant violated Section 9 of the Securities Exchange Act through the manipulative activities described herein, as the coordinated spoofing, layering, quote stuffing, tape painting, and wash trading patterns across the June 24 to December 26, 2025 sessions constitute a series of acts or practices to induce purchases/sales via deceptive devices [Exhibits 1–20].

141.   Defendant engaged in spoofing, bid layering, wash trading, and other

manipulative tactics prohibited by Section 9, as repeatedly documented in the rapid non-bona fide order placements, layered stacks, matched buy/sell clusters, and micro-lot probing in the trade tapes and Level II videos [Exhibits 1–20].

142.   Plaintiff alleges that the transactions as listed on Exhibit B violated Section 9(e) of the Securities Exchange Act, as the specific instances of spoofing, layering, and wash trades in the analyzed sessions directly induced trading through false market signals [Exhibits 1–20].

143.   Plaintiff purchased or sold securities at prices affected by defendant's manipulative activities, as the artificial pinning, failed breakouts, and downward resets despite retail buy surges directly influenced execution levels in the June to December 2025 data [Exhibits 1–20].

144.   Plaintiff traded securities whose prices were artificially inflated or depressed as a result of defendant's manipulative activities, as evidenced by the suppressed ranges and sell dominance overriding demand in the reviewed recordings [Exhibits 1–20].

145.   Plaintiff suffered damages as a result of defendant's manipulative activities, as the distorted market conditions led to trading at manipulated prices across the sessions [Exhibits 1–20].

146.   Plaintiff incurred financial losses by trading securities at artificially inflated or depressed prices, as the engineered fades and pinning caused execution at unfavorable levels in the analyzed exhibits [Exhibits 1–20].

147.   Plaintiff alleges that Defendant's violations of Section 9 caused plaintiff's damages, as the manipulative tactics directly resulted in suppressed valuation and impaired fair trading in the June to December 2025 period [Exhibits 1–20].

148.   Plaintiff's financial losses were directly caused by the artificial price movements resulting from defendant's manipulative activities, as the spoofing, layering, and wash trades created false supply/demand signals leading to depressed prices in the documented sessions [Exhibits 1–20].

**COUNT IV - Market Manipulation through Spoofing and Bid Layering**

1    **(Against all Defendants)**

2    149.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1

3    through 148 as if fully set forth herein.

4    150.    Defendant placed orders to buy or sell securities with no intention to

5    execute them.

6    151.    Defendant engaged in spoofing by placing and quickly canceling orders

7    that it never intended to execute.

8    152.    Defendant engaged in bid layering by placing multiple limit orders at

9    different price levels away from the inside market, with no intention of executing those

10    orders.

11    153.    Defendant's spoofing and bid layering created false impressions of market

12    activity.

13    154.    Defendant's activities created false impressions of supply and demand,

14    market depth, and liquidity.

15    155.    Defendant's spoofing and bid layering induced others, including plaintiff, to

16    trade based on those false impressions.

17    156.    Plaintiff and other market participants made trading decisions based on the

18    false market information created by defendant's spoofing and bid layering.

19    157.    Defendant acted with scienter in conducting its spoofing and bid layering

20    activities.

21    158.    Defendant knowingly and intentionally engaged in spoofing and bid

22    layering to manipulate securities prices.

23    159.    Defendant's spoofing and bid layering caused damages to plaintiff.

24    160.    Plaintiff suffered financial losses by trading securities at artificially inflated

25    or depressed prices caused by defendant's spoofing and bid layering.

26    161.    Defendant placed orders to buy or sell securities with no intention to execute

27    them, as evidenced by the rapid placement and cancellation of large bid and ask sizes in

28    multiple sessions [Exhibits 1–20].

162.    Defendant engaged in spoofing by placing and quickly canceling orders that it never intended to execute, as observed in the June 23, 2025 recording where bid sizes at $0.0306 increased from 154,000 to 224,000 shares without corresponding execution [Exhibit 1], the July 2025 video where bid sizes at $0.0262 fluctuated from 16,000 to 50,000 shares [Exhibit 7], and the December 2025 pre-market and intraday sessions where bid and ask sizes were flashed and withdrawn [Exhibits 15, 16].

163.    Defendant engaged in bid layering by placing multiple limit orders at different price levels away from the inside market, with no intention of executing those orders, as shown in the June–July 2025 sequences where bid and ask layers were built and synchronized [Exhibits 2–7], and in the December 2025 recordings where layers were adjusted to create artificial depth [Exhibits 15, 16].

164.    Attached as **Exhibit C** are transactions that are SPECIFIC INSTANCES OF SPOOFING AND BID LAYERING [Exhibits 1, 7, 15, 16].

165.    Defendant's spoofing and bid layering created false impressions of market activity, as demonstrated in the patterns where non-bona fide orders misled market perception across the analyzed sessions [Exhibits 1–20].

166.    Defendant's activities created false impressions of supply and demand, market depth, and liquidity, as seen in the coordinated quote behaviors that distorted the order book in the reviewed recordings [Exhibits 1–20].

167.    Defendant's spoofing and bid layering induced others, including plaintiff, to trade based on those false impressions, as the manipulated market conditions influenced trading decisions in the June to December 2025 sessions [Exhibits 1–20].

168.    Plaintiff and other market participants made trading decisions based on the false market information created by defendant's spoofing and bid layering, as evidenced by the repeated failed breakouts and price suppressions in the analyzed exhibits [Exhibits 1–20].

169.    Attached is ADDITIONAL FACTUAL ALLEGATIONS REGARDING INDUCED TRADING. [Exhibits 1–20].

170.    Defendant acted with scienter in conducting its spoofing and bid layering activities, as the intentional and recurring nature of the manipulations is clear in the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16].

171.    Defendant knowingly and intentionally engaged in spoofing and bid layering to manipulate securities prices, as demonstrated by the systematic patterns of non-bona fide orders and coordinated actions in the June 23, 2025 recording [Exhibit 1], the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16].

172.    Attached are transactions that are SPECIFIC INSTANCES OF SPOOFING AND BID LAYERING [Exhibits 1, 7, 15, 16].

173.    Defendant's spoofing and bid layering caused damages to plaintiff, as the artificial price suppression led to financial losses across the analyzed sessions [Exhibits 1–20].

174.    Plaintiff suffered financial losses by trading securities at artificially inflated or depressed prices caused by defendant's spoofing and bid layering, as evidenced by the distorted market conditions and failed price movements in the June to December 2025 recordings [Exhibits 1–20]

### COUNT V - Market Manipulation through Wash Trading
### (Against all Defendants)

175.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 177 as if fully set forth herein.

176.    Defendant engaged in transactions where there was no change in beneficial ownership.

177.    Defendant simultaneously or nearly simultaneously bought and sold the same securities, resulting in no change in beneficial ownership.

178.    Attached as **Exhibit D** is transactions that are SPECIFIC INSTANCES OF SPECIFIC WASH TRADES.

179.    Defendant's wash trading created false or misleading signals of trading activity.

180.    Defendant's wash trading created false impressions of market interest, liquidity, and trading volume.

181.    Attached as **Exhibit E** are transactions that are SPECIFIC INSTANCES OF SPECIFIC WASH TRADES.

182.    Defendant intended to create artificial market activity through its wash trading.

183.    Defendant knowingly and intentionally engaged in wash trading to manipulate securities prices and market perceptions.

184.    Defendant's wash trading affected the price of securities.

185.    Defendant's artificial trading activity influenced the market price of the affected securities.

186.    Attached as **Exhibit F** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING PRICE EFFECTS.

187.    Defendant's wash trading caused damages to plaintiff.

188.    Plaintiff suffered financial losses by trading securities at artificially inflated or depressed prices caused by defendant's wash trading.

189.    Defendant engaged in transactions where there was no change in beneficial ownership, as evidenced by matched buy/sell clusters and synchronized micro-lot prints in multiple sessions [Exhibits 1–20].

190.    Defendant simultaneously or nearly simultaneously bought and sold the same securities, resulting in no change in beneficial ownership, as observed in the rapid counter-trades and identical quantity prints during momentum tests across the analyzed sessions [Exhibits 1–20].

191.    Attached as **Exhibit D** are transactions that are SPECIFIC INSTANCES OF SPECIFIC WASH TRADES [Exhibits 1, 7, 15, 16].

192.    Defendant's wash trading created false or misleading signals of trading

activity, as shown in the micro-lot clusters and matched prints inflating volume without net change in the reviewed recordings [Exhibits 1–20].

193.    Defendant's wash trading created false impressions of market interest, liquidity, and trading volume, as demonstrated by the synthetic prints and artificial depth in the June to December 2025 sessions [Exhibits 1–20].

194.    Attached as **Exhibit E** are transactions that are SPECIFIC INSTANCES OF SPECIFIC WASH TRADES [Exhibits 1, 7, 15, 16].

195.    Defendant intended to create artificial market activity through its wash trading, as the recurring patterns of non-bona fide matched trades indicate deliberate manipulation in the analyzed exhibits [Exhibits 1–20].

196.    Defendant knowingly and intentionally engaged in wash trading to manipulate securities prices and market perceptions, as evidenced by the systematic micro-lot probing and volume inflation in the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16].

197.    Defendant's wash trading affected the price of securities, as the artificial volume and signals contributed to pinning and reversals in the reviewed sessions [Exhibits 1–20].

198.    Defendant's artificial trading activity influenced the market price of the affected securities, as shown in the failed breakouts and suppressed momentum despite retail buying in the June to December 2025 recordings [Exhibits 1–20].

199.    Attached as **Exhibit F** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING PRICE EFFECTS [Exhibits 1–20].

200.    Defendant's wash trading caused damages to plaintiff, as the distorted market conditions led to trading at manipulated prices across the analyzed sessions [Exhibits 1–20].

201.    Plaintiff suffered financial losses by trading securities at artificially inflated or depressed prices caused by defendant's wash trading, as evidenced by the suppressed

price action and failed momentum in the June to December 2025 exhibits [Exhibits 1–20].

### COUNT VI - Market Manipulation through Naked Short Selling

### (Against all Defendants)

202.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 204 as if fully set forth herein.

203.    Defendant sold securities short without borrowing or arranging to borrow them.

204.    Defendant engaged in naked short selling by selling securities short without having located shares to borrow.

205.    Attached as **Exhibit G** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING NAKED SHORT SELLING.

206.    Defendant failed to deliver securities within the required settlement period.

207.    Defendant's naked short sales resulted in failures to deliver securities when due.

208.    Defendant intended to manipulate the market through its naked short selling.

209.    Defendant knowingly and intentionally engaged in naked short selling to artificially depress securities prices.

210.    Defendant's naked short selling affected the price of securities.

211.    Defendant's naked short selling artificially depressed the price of the affected securities.

212.    Defendant's naked short selling caused damages to plaintiff.

213.    Plaintiff suffered financial losses as a result of artificially depressed securities prices caused by defendant's naked short selling.

214.    Defendant sold securities short without borrowing or arranging to borrow them, as indicated by the persistent high short volume percentages (often 40–120% of daily volume) and significant failures to deliver in prior periods, combined with sell dominance absorbing retail buys without corresponding price lifts across the analyzed

1    sessions [Exhibits 1–20].

2    215.    Defendant engaged in naked short selling by selling securities short without

3    having located shares to borrow, as suggested by the extreme short volume ratios

4    exceeding total volume on certain days (e.g., up to 121% short percentage) and historical

5    FTD spikes unresolved in price action, allowing unlimited downside supply in the

6    reviewed trading patterns [Exhibits 1–20].

7    216.    Attached as **Exhibit G** are transactions that are SPECIFIC INSTANCES OF

8    ALLEGATIONS    REGARDING    NAKED    SHORT    SELLING    [Exhibits    1–20,

9    supplemented by FTD data showing peaks like 5,146,878 shares on August 7, 2025].

10    217.    Defendant failed to deliver securities within the required settlement period,

11    as evidenced by the documented FTD quantities totaling over 9 million shares across

12    multiple dates, correlating with periods of heavy sell pressure and price suppression

13    [Exhibits 1–20].

14    218.    Defendant's naked short sales resulted in failures to deliver securities when

15    due, as shown in the FTD spikes (e.g., August 2025 totals ~8.35M shares) aligning with

16    sessions of artificial downside volume overwhelming buys [Exhibits 1–20].

17    219.    Defendant intended to manipulate the market through its naked short selling,

18    as the recurring patterns of high short volume on momentum days and unresolved delivery

19    issues facilitated sustained price depression despite retail demand [Exhibits 1–20].

20    220.    Defendant knowingly and intentionally engaged in naked short selling to

21    artificially depress securities prices, as indicated by the systematic short dominance (e.g.,

22    66–80% sells in high-volume sessions) and FTD history enabling downside resets in the

23    June to December 2025 recordings [Exhibits 1–20].

24    221.    Defendant's naked short selling affected the price of securities, as the

25    elevated short percentages and delivery failures contributed to pinning and downward

26    pressure in the analyzed exhibits [Exhibits 1–20].

27    222.    Defendant's naked short selling artificially depressed the price of the

28    affected securities, as demonstrated by the failed breakouts and declining trend despite

buy volume and company growth reports in the sessions reviewed [Exhibits 1–20].

223.    Defendant's naked short selling caused damages to plaintiff, as the resulting suppressed market conditions led to trading at lower manipulated prices across the period [Exhibits 1–20].

224.    Plaintiff suffered financial losses as a result of artificially depressed securities prices caused by defendant's naked short selling, as evidenced by the persistent downside bias and absorption of retail buys without upward reflection in the June to December 2025 data [Exhibits 1–20].

### COUNT VII - Market Manipulation through Quote Stuffing and Micro Stuffing
### (Against all Defendants)

225.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 228 as if fully set forth herein.

226.    Defendant rapidly placed and canceled large numbers of orders.

227.    Defendant engaged in quote stuffing by placing and quickly canceling large numbers of orders in rapid succession.

228.    Defendant engaged in micro stuffing by placing and quickly canceling small orders in rapid succession.

229.    Attached as **Exhibit H** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING QUOTE STUFFING AND MICRO STUFFING.

230.    Defendant intended to overload market systems or create confusion through its quote stuffing and micro stuffing.

231.    Defendant knowingly and intentionally engaged in quote stuffing and micro stuffing to disrupt normal market operations.

232.    Defendant gained advantage through market delays or confusion caused by its quote stuffing and micro stuffing.

233.    Defendant exploited the market disruptions caused by its quote stuffing and micro stuffing to execute trades at favorable prices.

234.    Defendant's quote stuffing and micro stuffing affected the price of

securities.

235.    Defendant's activities created artificial volatility and price movements in the affected securities.

236.    Defendant's quote stuffing and micro stuffing caused damages to plaintiff.

237.    Plaintiff suffered financial losses as a result of artificial price movements and market disruptions caused by defendant's quote stuffing and micro stuffing.

238.    Defendant rapidly placed and canceled large numbers of orders, as evidenced by the recurring rapid quote reloads and size fluctuations without full execution in the Level II videos across multiple sessions [Exhibits 1–20].

239.    Defendant engaged in quote stuffing by placing and quickly canceling large numbers of orders in rapid succession, as observed in the synchronized bid/ask reloads and unexecuted size bursts during volume spikes in the analyzed recordings [Exhibits 1–20].

240.    Defendant engaged in micro stuffing by placing and quickly canceling small orders in rapid succession, as demonstrated by the clusters of tiny trades (e.g., 1–888 shares at pivots) and micro-adjustments in the ladder during pinning periods [Exhibits 1–20].

241.    Attached as **Exhibit H** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING QUOTE STUFFING AND MICRO STUFFING [Exhibits 1–20].

242.    Defendant intended to overload market systems or create confusion through its quote stuffing and micro stuffing, as the rapid non-bona fide order placements disrupted natural price discovery and created artificial depth in the reviewed sessions [Exhibits 1–20].

243.    Defendant knowingly and intentionally engaged in quote stuffing and micro stuffing to disrupt normal market operations, as shown in the systematic rapid reloads and tiny pivot trades timed to fade momentum in the June to December 2025 videos [Exhibits 1–20].

244.    Defendant gained advantage through market delays or confusion caused by its quote stuffing and micro stuffing, as the flooded book allowed absorption of buys without lift and execution of counters at favorable levels [Exhibits 1–20].

245.    Defendant exploited the market disruptions caused by its quote stuffing and micro stuffing to execute trades at favorable prices, as evidenced by the sell dominance and price resets following buy clusters in the analyzed exhibits [Exhibits 1–20].

246.    Defendant's quote stuffing and micro stuffing affected the price of securities, as the artificial disruptions contributed to pinning and downward pressure despite retail volume [Exhibits 1–20].

247.    Defendant's activities created artificial volatility and price movements in the affected securities, as demonstrated by the failed breakouts and engineered fades in the sessions reviewed [Exhibits 1–20].

248.    Defendant's quote stuffing and micro stuffing caused damages to plaintiff, as the distorted market conditions led to trading at manipulated prices [Exhibits 1–20].

249.    Plaintiff suffered financial losses as a result of artificial price movements and market disruptions caused by defendant's quote stuffing and micro stuffing, as evidenced by the suppressed price action and absorbed buys in the June to December 2025 data [Exhibits 1–20].

## COUNT VIII - Violation of Nevada Securities Law
### (Against all Defendants)

250.    Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 253 as if fully set forth herein

251.    Nevada securities law prohibits specific conduct in connection with securities transactions. In connection with the offer to sell, sale, offer to purchase or purchase of a security, a person shall not, directly or indirectly: employ any device, scheme or artifice to defraud; make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances under which they are made; or engage in an act, practice or course of

business which operates or would operate as a fraud or deceit upon a person. Nev. Rev. Stat. Ann. § 90.570. Nevada's blue sky laws parallel federal Rule 10b-5 requirements. *Sec'y of State v. Tretiak*, 117 Nev. 299, 22 P.3d 1134 (2001). The elements of a Rule 10b-5 claim are: (1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages. *Sec'y of State v. Tretiak*, 117 Nev. 299, 22 P.3d 1134 (2001).

252.    Defendant employed devices, schemes, and artifices to defraud in connection with the offer, sale, or purchase of securities.

253.    Defendant engaged in spoofing, bid layering, wash trading, naked short selling, quote stuffing, and other manipulative tactics that constitute devices, schemes, and artifices to defraud.

254.    Attached as **Exhibit I** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS FRAUDULENT DEVICES.

255.    Defendant made untrue statements of material facts or omitted to state material facts necessary to make statements not misleading in connection with the offer, sale, or purchase of securities.

256.    Defendant's manipulative activities created false impressions about market activity, supply and demand, and securities prices.

257.    Defendant engaged in acts, practices, or courses of business which operated as a fraud or deceit upon persons in connection with the offer, sale, or purchase of securities.

258.    Defendant's pattern of manipulative activities constituted a course of business operating as a fraud or deceit upon market participants, including plaintiff.

259.    Defendant's violations of Nevada securities law caused damages to plaintiff.

260.    Plaintiff suffered financial losses as a direct and proximate result of defendant's fraudulent and deceptive practices.

261.    Defendant employed devices, schemes, and artifices to defraud in connection with the offer, sale, or purchase of securities, as the coordinated patterns of

spoofing, layering, quote stuffing, tape painting, and sell dominance created deceptive market conditions across the analyzed sessions [Exhibits 1–20].

262.   Defendant engaged in spoofing, bid layering, wash trading, naked short selling, quote stuffing, and other manipulative tactics that constitute devices, schemes, and artifices to defraud, as repeatedly documented in the rapid non-bona fide order placements, layered stacks, matched clusters, high short volume with delivery indicators, and rapid reloads in the trade tapes and Level II videos [Exhibits 1–20].

263.   Attached as **Exhibit I** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS FRAUDULENT DEVICES [Exhibits 1–20].

264.   Defendant made untrue statements of material facts or omitted to state material facts necessary to make statements not misleading in connection with the offer, sale, or purchase of securities, as the artificial order book depth and volume signals misrepresented true supply/demand in the reviewed recordings [Exhibits 1–20].

265.   Defendant's manipulative activities created false impressions about market activity, supply and demand, and securities prices, as evidenced by the illusory depth, inflated short volume, and pinned ranges despite retail buying in the June to December 2025 sessions [Exhibits 1–20].

266.   Defendant engaged in acts, practices, or courses of business which operated as a fraud or deceit upon persons in connection with the offer, sale, or purchase of securities, as the systematic suppression and deceptive quoting directly deceived market participants about fair pricing [Exhibits 1–20].

267.   Defendant's pattern of manipulative activities constituted a course of business operating as a fraud or deceit upon market participants, including plaintiff, as the recurring tactics across multiple months distorted valuation and liquidity [Exhibits 1–20].

268.   Defendant's violations of Nevada securities law caused damages to plaintiff, as the fraudulent devices and deceptive practices led to trading at manipulated prices in the analyzed exhibits [Exhibits 1–20].

269.   Plaintiff suffered financial losses as a direct and proximate result of

defendant's fraudulent and deceptive practices, as the suppressed price action and artificial conditions resulted in unfavorable executions across the sessions [Exhibits 1–20].

## PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter judgment in its favor and against all defendants as follows:

1.  Compensatory damages in an amount to be determined at trial;

2.  Punitive damages against defendant pursuant to Nev. Rev. Stat. Ann. § 42.005 in an amount to be determined at trial;

3.  Disgorgement of all profits obtained by defendant through its illegal market manipulation activities;

4.  Permanent injunctive relief prohibiting defendant from engaging in the manipulative activities described herein;

5.  Reasonable attorneys' fees and costs pursuant to Nev. Rev. Stat. Ann. § 18.010;

6.  Pre-judgment and post-judgment interest to the maximum extent permitted by law; and

7.  Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 1, 2026                    Respectfully submitted

/s/  Marc Steven Applbaum
Marc Steven Applbam, Esq. SBN # 222511
Counsel for Plaintiff
Midway Law Firm APC
4275 Executive Square Suite 200
La Jolla, CA 92037
marc@midwaylawfirm.com

1

## INDEX OF EXHIBITS

2

3

4

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | AABB — June 23, 2025 Trading Session | 40 |
| 2 | Analysis of AABB Trade Tape on June 24, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 45 |
| 3 | Analysis of AABB Trade Tape on July 1, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 53 |
| 4 | Analysis of AABB Trade Tape on July 10, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 60 |
| 5 | Analysis of AABB Trade Tape on July 15, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 66 |
| 6 | Analysis of AABB Trade Tape on July 18, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 73 |
| 7 | Analysis of AABB Trade Tape on July 23, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 79 |
| 8 | Analysis of AABB Trade Tape on July 29, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 85 |
| 9 | Analysis of AABB Trade Tape on August 25, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 91 |
| 10 | Analysis of AABB Trade Tape on September 29, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 99 |
| 11 | Analysis of AABB Trade Tape on December 1, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 106 |
| 12 | Analysis of AABB Trade Tape on December 2, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 114 |

COMPLAINT; JURY DEMAND

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 13 | Analysis of AABB Trade Tape on December 4, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 121 |
| 14 | Analysis of AABB Trade Tape on December 8, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 141 |
| 15 | Analysis of AABB Trade Tape on December 16, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 149 |
| 16 | Analysis of AABB Trade Tape on December 17, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 160 |
| 17 | Analysis of AABB Trade Tape on December 19, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 179 |
| 18 | Analysis of AABB Trade Tape on December 23, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 185 |
| 19 | Analysis of AABB Trade Tape on December 26, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 193 |
| 20 | Overview Presentation: AABB Stock Trade Data Breakdown (June 24 – December 26, 2025) | 203 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT; JURY DEMAND