MARC STEVEN APPLBAUM, ESQ. SBN# 222511
MIDWAY LAW FIRM APC
4275 Executive Square Suite 200
La Jolla, CA 92037
marc@midwaylawfirm.com

Attorneys for Plaintiff
ASIA BROADBAND, INC. ("AABB")

# UNITED STATES DISTRICT COURT

# IN THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ASIA BROADBAND, INC. ("AABB"), | Case No: 2:26-CV-00175-FLA-MAA |
| Plaintiff, | **PLAINTIFFS OPPOSITION TO DEFENDANTS 12b MOTION TO DISMISS** |
| vs. | |
| VIRTU FINANCIAL INC. GTS SECURITIES, G1 EXECUTION SERVICES, DOES 1-50, inclusive, and DOE Business Entities 1-50, inclusive, | |
| Defendants. | |

- 1 -

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

## Introduction

Plaintiff ASIA BROADBAND, INC. ("AABB") respectfully submits this opposition to Defendant VIRTU FINANCIAL INC. Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).

Defendant seeks dismissal on the grounds that PLAINTIFF fails to state a claim for market manipulation under Section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5 and Section 9(a) of the Exchange Act because the Complaint fails to plead each of the essential elements of loss causation, reliance, a manipulative act and a strong interference of scienter, with particularity required by Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act and that Plaintiff fails to state a claim for market manipulation under Nevada Revised Statutes

This motion should be denied because Plaintiff's Complaint alleges sufficient factual matter, accepted as true, to state plausible claims for relief under its applicable legal theories as stated herein. *Ashcroft v. Iqbal,  556 U.S. 662, 129 S. Ct. 1937  (2009).*

The Complaint alleges key factual allegations construed in the light most favorable to Plaintiff, satisfy the Twombly/Iqbal plausibility standard and establish Plaintiff's entitlement to relief.  *Zixiang Li v.  Kerry*, 710 F.3d 995 (9th Cir. 2013). Defendant's motion improperly invites this Court to weigh evidence, resolve factual disputes, and credit Defendant's version of events—none of which is appropriate at the motion to dismiss stage.  *Disability Rights Mont., Inc. v. Batista,*

*930 F.3d 1090 (9th Cir. 2019). For the reasons set forth below, t*his Court should deny Defendant's Motion to Dismiss and permit this action to proceed.

Preliminary Statement

Defendants Motion to Dismiss characterizes Asia Broadband, Inc. ("AABB" or the "Company") in its Preliminary Statement and "Parties" background — specifically, the description of AABB as a "speculative crypto company that has generated no revenue," a company that began "as an e-learning program in China" followed by "nearly a decade of dormancy," and whose business is in a "disastrous state." It does not address the motion's legal grounds (loss causation, reliance, manipulative act, and scienter under Rule 9(b) and the PSLRA), which are treated separately in counsel's opposition.

All financial and operational figures below are drawn from AABB's own public disclosures — principally the Annual Report for the period ending December 31, 2025 (the same document Defendants cite as Exhibit E), the quarterly disclosure for the period ending March 31, 2026, and the Company's September 30, 2015 OTC disclosure. Three qualifications apply throughout and are stated here once: (i) the Company's financial statements are *unaudited* and the Company reports it currently has *no auditor*; (ii) the 2025 report contains *going-concern* language in the Company's own words; and (iii) asset and equity growth was accompanied by substantial share issuance. Each is addressed in context below so that the points in this memo can be advanced credibly rather than overstated.

I.  AABB Is a Precious-Metals Producer, Not a "Speculative Crypto Company" or an "E-Learning" Venture

Defendants' framing rests on two descriptions that do not fairly represent the Company as it exists today. The first — "speculative crypto company" —

elevates a secondary, developmental segment into the identity of the whole enterprise. The second — an "e-learning program in China" followed by "dormancy" — describes a predecessor business that was discontinued in 2005, two decades and an entirely different business model ago. AABB's own filings describe the Company, first and foremost, as "a resource company  focused on the production, supply and sale of precious and base metals."

A.  The 2015 Starting Point

As of its September 30, 2015 OTC disclosure, AABB reported total assets of **$188**, no cash, and no operating business. The filing states the Company was "in the development stage," was "inactive," and was "currently seeking a viable business opportunity or an acceptable merger candidate," offering "no products or services."   The Shanghai Broadband Network e-learning venture that Defendants reference had been discontinued in 2005 and generated only approximately $50,000 in lifetime revenue.  Defendants' own brief concedes the Company thereafter exited that line and entered the mining industry.

B.  Operational Build-Out, 2015–2025

Per Note 3 to the 2025 financial statements, AABB entered the mining business in late 2015, acquired its initial Guerrero concessions, and completed its first mineral sales by the end of 2016. Over the following decade it assembled a portfolio of gold-mining properties and processing infrastructure in Mexico, including:

- The Tequila Gold Mine Project (75% joint-venture interest; Jalisco; Q4 2021), with an on-site processing mill;

- The Zodiac and La Paz Gold Mine Projects (Jalisco; 2022), La Paz located in Etzatlan;

- 4 -

- A long-term processing agreement (December 2022) securing exclusive access to an approximately 4-million-ton gold-and-silver ore stockpile in Las Jimenez, Etzatlan, together with an adjacent land parcel acquired for an on-site processing plant;

- The Picachos IV concession (4,081 hectares; Jalisco; acquired Q1 2024); and

- The Etzatlan processing facility, which commenced operations in Q2 2025, alongside the acquisition of a proprietary reduced-graphene-oxide (rGO) gold-recovery technology in the same period.

C. Financial Trajectory: 2015 vs. 2025

Measured against the $188 in total assets reported in 2015, the Company's reported position at year-end 2025 reflects a fundamentally different enterprise than the enterprise reflected in Defendants Motion to Dismiss.

### Statement of Facts

Plaintiff is a Nevada corporation that owns and trades securities on national securities exchanges in this district. Contrary to Defendants Opposition engaged in a pattern and practice of market manipulation tactic designed to artificially influence the price of securities owned or traded by plaintiff.

Defendants engaged in "spoofing" by placing orders to buy or sell securities with the intent to cancel the orders before execution, thereby creating false impressions about supply and demand.

Defendants engaged in "bid layering" by placing multiple limit orders at different price levels away from the inside market, creating the false appearance of market depth and liquidity.

Defendants engaged in "wash trading" by simultaneously or nearly simultaneously buying and selling the same securities, creating the false appearance of market activity while resulting in no change in beneficial ownership.

Defendants colluded with other market participants to coordinate trading activities designed to manipulate securities prices.

Defendant engaged in "naked short selling" by selling securities short without first borrowing or arranging to borrow the securities, and subsequently failing to deliver the securities when required.

Defendant engaged in "quote stuffing" by placing and quickly canceling large numbers of orders in rapid succession, overwhelming market systems and creating artificial volatility.

Defendant engaged in "micro stuffing" by placing and quickly canceling small orders in rapid succession to create false impressions of market activity.

Defendant's manipulative activities were conducted through the use of interstate commerce and national securities exchanges.

Defendant's manipulative activities were conducted with the intent to artificially influence securities prices and to induce other market participants, including plaintiff, to trade based on false market information.

As a direct and proximate result of defendant's manipulative activities, plaintiff purchased and/or sold securities at artificially inflated and/or depressed prices.

Plaintiff has suffered substantial financial losses as a result of defendant's manipulative activities.

Plaintiff Asia Broadband, Inc. ("AABB" or "Plaintiff"), by and through its undersigned counsel, brings this action under Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange

Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other

similarly situated persons who sold AABB common stock between February 1, 2021 and

December 31, 2025 and were damaged thereby.

21.    Plaintiff alleges the following based upon personal knowledge as to its own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things: review and analysis of Level-2 trading video archives; contemporaneous trade tape data; market microstructure analysis; public disclosures; academic research relating to spoofing, wash trading, and market-maker manipulation; and statistical evidence of manipulative Order-flow behavior by Defendants GTSM and NITE during the Class Period. Plaintiff's investigation is ongoing and substantial additional evidentiary support is expected to exist for the allegations herein after a reasonable opportunity for discovery.

## Legal Standard

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint  states a claim upon which relief can be granted. USCS Fed Rules Civ Proc R 12. When evaluating such a motion, the Court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946  (9th Cir. 2013), *Disability Rights Mont., Inc. v. Batista*, 930 F.3d 1090 (9th Cir. 2019).  The Court may consider the complaint, exhibits attached to the complaint, documents incorporated by reference in the complaint, and matters of public record. Williston Basin Interstate Pipeline Co. v. An Exclusive Gas

Storage Leasehold & Easement in the Cloverly Subterranean Geological Formation, 524 F.3d 1090 (9th Cir. 2008). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009)  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009), United States ex rel. *Lee v. Corinthian Colls*., 655 F.3d 984 (9th Cir. 2011). The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009)  While Rule 8 does not require detailed factual allegations, it demands more than an unadorned accusation of unlawful conduct.  *Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009)*  A pleading that offers labels and conclusions or a formulaic recitation  of the elements of a cause of action will not suffice. *Ashcroft v.  Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009)*.

However, the Court must discount only conclusory statements that are not entitled to the presumption of truth; well-pleaded factual allegations must be accepted as true and analyzed to determine whether they plausibly give rise to an entitlement to relief. Chavez v. United States, 683 F.3d 1102 (9th Cir. 2012), Kwan v. SanMedica Int'l, 854 F.3d 1088 (9th Cir. 2017). In assessing plausibility, the Court relies on judicial experience and common sense. Landers v. Quality Communs., Inc., 771 F.3d 638 (9th Cir. 2015), Eclectic Props. E., Ltd. Liab. Co. v. Marcus & Millichap Co., 751 F.3d 990 (9th Cir. 2014). The inquiry is context-specific and requires the Court to draw on its understanding of the claim at issue. Conway v. Heyl (In re Heyl), 590 B.R. 898 (B.A.P. 8th Cir. 2018). Dismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal

theory or (2) fails to allege sufficient facts to support a cognizable legal theory. *Zixiang Li v. Kerry, 710 F.3d 995 (9th Cir. 2013)*. Federal Rule of Civil Procedure 8 does not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted, so long as the plaintiff has pleaded facts sufficient to show that the claim has substantive plausibility. *Fuerst v. Hous. Auth. of the City of Atlanta* 38 F.4th 860 (11th Cir. 2022). Each allegation must be simple, concise, and direct, but no technical form is required. *Fuerst v. Hous. Auth. of the City of Atlanta,* 38 F.4th 860 (11th Cir. 2022).

ARGUMENT

**A. PLAINIFFS COMPLAINT STATES A PLAUSIBLE CLAIM FOR ALL COUNTS**

a. Violation of Rule 10b-5

Paintiff Has Alleged All Required Elements of All Elements o each Claim Under Governing Law. Complaint's factual allegations, if accepted as true, satisfy each element. Plaintiff has adequately alleged each element. First, the Complaint alleges each and every allegation that plausibly establishishes each element that Plaintiff alleged in its Complaint,. At this stage, Plaintiff need only plead factual content that allows the Court to draw the reasonable inference that [ELEMENT TWO] is satisfied, and the Complaint does so. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937 (2009). Third, the Complaint alleges sufficient factual obligations and further argues that Defendant's arguments conflates the pleading standard with the summary judgment standard. The question at this stage is not whether Plaintiff will ultimately prevail, but whether the Complaint alleges enough facts to cross the line from possibility to plausibility. *Landers v. Quality Communs., Inc*., 771 F.3d 638 (9th Cir. 2015), *Somers v. Apple, Inc*., 729 F.3d 953 (9th Cir. 2013). The Complaint

does so. Fourth, Plaintiff alleges factual allegations allegations are neither conclusory nor speculative; they provide specific factual content supporting a plausible inference; of ken together, these well-pleaded allegations state a facially plausible claim. The Court must accept them as true and draw all reasonable inferences in Plaintiff's favor. Chubb Custom Ins. Co. v. Space Sys./Loral, Inc., 710 F.3d 946 (9th Cir. 2013), Disability Rights Mont., Inc. v. Batista, 930 F.3d 1090 (9th Cir. 2019).

i.   Defendant's Arguments Improperly Challenge the Sufficiency of the Evidence Rather Than the Sufficiency of the Pleading Defendant's motion seeks dismissal by disputing the truth of Plaintiff's factual allegations, offering alternative explanations for Plaintiff's allegations, and arguing that Plaintiff cannot prove the claims. These arguments are inappropriate at the motion to dismiss stage. A Rule 12(b)(6) motion tests the legal sufficiency of the complaint, not the strength of the evidence. Wilborn v. Jones, 761 F. App'x 908 (11th Cir. 2019). The Court must take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff. Wilborn v. Jones, 761 F. App'x 908 (11th Cir. 2019). The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable only to legal conclusions, not to factual allegations. Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009), *Wilborn v. Jones*, 761 F. App'x 908 (11th Cir. 2019). This argument asks the Court to credit Defendant's version of events over Plaintiff's allegations. But on a motion to dismiss, the Court may not weigh competing factual narratives or resolve factual disputes. Kwan v. SanMedica Int'l, 854 F.3d 1088 (9th Cir. 2017). Where a complaint pleads facts that are merely consistent with a defendant's liability, it crosses the plausibility threshold if the factual content allows the court to draw the reasonable inference that the

defendant is liable. *Ashcroft v. Iqbal*,  556 U.S. 662, 129 S. Ct. 1937 (2009). Moreover, Defendant's reliance on its characterizations of Plaintiffs business model is flawed with inaccuracies which constitutes matter outside the pleadings. If the Court were to consider such materials, the motion would need to be converted to one for summary judgment under Rule 56, and all parties would need a reasonable opportunity to present pertinent materials. USCS Fed Rules Civ Proc R 12. Defendant has not sought such conversion, and the motion should be decided solely on the face of the Complaint.

ii.   Plaintiff's Allegations Are Factual, Not Conclusory Defendant contends that certain allegations in the Complaint are conclusory and therefore not entitled to the presumption of truth. This argument fails because Plaintiff has provided factual content supporting each material allegation. While threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice, Plaintiff has alleged far more. United States ex rel. Lee v. Corinthian Colls., 655 F.3d 984 (9th Cir. 2011). The Complaint alleges specific facts regarding [CATEGORIES OF FACTUAL DETAIL: who, what, when, where, how]. [Compl. ¶¶ [PARAGRAPH NUMBERS]]. These are precisely the types of factual allegations that must be accepted as true and analyzed for plausibility. Eclectic Props. E., Ltd. Liab. Co. v. Marcus & Millichap Co., 751 F.3d 990 (9th Cir. 2014). Defendant misconstrues the Iqbal framework by labeling all allegations adverse to Defendant as conclusory.

The Supreme Court's directive to discount conclusory allegations applies to legal conclusions and formulaic recitations of elements, not to factual allegations that happen to track or support the elements of a claim. Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937 (2009). Where, as here, the plaintiff provides factual content that allows the court to draw reasonable inferences of

liability, the plausibility standard is satisfied. Kwan v. SanMedica Int'l, 854 F.3d 1088 (9th Cir. 2017).

iii. Policy Considerations Support Denial of the Motion Dismissal at the pleading stage is appropriate only when it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Somers v. Apple, Inc., 729 F.3d 953 (9th Cir. 2013). The Federal Rules favor resolution of disputes on the merits rather than on pleading technicalities. Fuerst v. Hous. Auth. of the City of Atlanta, 38 F.4th 860 (11th Cir. 2022). Granting Defendant's motion would improperly foreclose Plaintiff's opportunity to develop a factual record through discovery and to prove the claims at trial. The policy underlying Rule 8 is to provide fair notice of the claim and the grounds on which it rests, not to require plaintiffs to plead themselves out of court by anticipating and negating all possible defenses. Zixiang Li v. Kerry, 710 F.3d 995 (9th Cir. 2013). Plaintiff has provided such notice. Defendant is fully apprised of the nature of the claims and the factual basis for them. Requiring more at this stage would impose a heightened pleading standard inconsistent with the Federal Rules. *Randall v. Scott* 610 F.3d 701 (11th Cir. 2010). Moreover, public policy is in diametric opposition to the early dismissal of civil rights claims would undermine the remedial purposes of Section 1983; early dismissal of fraud claims would insulate wrongdoers from accountability; early dismissal of negligence claims would deny injured plaintiffs their day in court]. The purposes of subtantive law are best served by permitting Plaintiff to proceed to discovery and, if appropriate, summary judgment, where the parties can develop and test the evidence. Summary Plaintiff has alleged sufficient factual matter to state a plausible claim for [CAUSE OF ACTION]. The Complaint satisfies Rule 8's notice-pleading standard and the Twombly/Iqbal

plausibility requirement. Defendant's arguments amount to factual disputes and evidentiary challenges inappropriate for resolution on a motion to dismiss. This Court should deny the motion and permit this claim to proceed.

b.    THE COMPLAINT STATES A PLAUSIBLE CLAIM FOR [SECOND CAUSE OF ACTION] [DRAFTING GUIDANCE: Repeat the structure used for the first claim. Address the elements of the second cause of action, show how the Complaint's allegations satisfy each element, respond to Defendant's specific arguments regarding this claim, and include a policy rationale section. Tailor the analysis to the legal standards governing this particular claim.]

i.    Plaintiff Has Alleged All Required Elements of its second claim.

ii.    Defendant's interpretation of its 12(b) opposition is inconsistent with its controlling authority in its legal arguments regarding the proper interpretation of the governing standard. Defendant's adverse authority cited by Defendant are in its controlling Ninth Circuit and Supreme Court authority supporting Plaintiff's interpretation.

iii.    The Complaint Provides Fair Notice and Satisfies Rule 8 and its complaint fails to provide adequate notice or contains insufficient detail requiring entitlement to relief, not detailed factual allegations.

iv.    Policy Considerations Support Plaintiff's Interpretation [Explain why Plaintiff's reading of the governing legal standard serves the purposes of the underlying statute or common law doctrine. Address systemic consequences of Defendant's interpretation. Connect to legislative intent, remedial purposes, or equitable considerations.] Summary [2-3 sentences restating why the second claim survives dismissal]

c. DEFENDANT'S ALTERNATIVE GROUNDS FOR DISMISSAL FAIL to provide any additional grounds for dismissal raised by Defendant that do not fit within the claim-by-claim analysis above.

i. Plaintiff Has Standing to Bring This Action under Article III standing requirements, injury in fact, causation, redressability. Plaintiff's allegations satisfy each prong.

ii. Plaintiff's Claims Are Not Barred by the Statute of Limitations f limitations: Identify the applicable limitations period. Show that the claims accrued within the limitations period based on the Complaint's allegations and that statute of limitations is an affirmative defense and dismissal under Rule 12(b)(6) on limitations grounds is appropriate only when the untimeliness appears on the face of the complaint.

iii. Plaintiff Has Stated Claims Against the Properly Named Defendants on the basis that the Complaint named the proper parties and that those parties have the capacity to be sued.

iv. Venue and Personal Jurisdiction Are Proper [If Defendant challenges venue under Rule 12(b)(3) or personal jurisdiction under Rule 12(b)(2): Address the specific challenge with citation to the Complaint's allegations and relevant authority. Note that these defenses are waived if not raised in the first responsive pleading or motion.]

v. This Court Has Subject Matter Jurisdiction [If Defendant challenges subject matter jurisdiction under Rule 12(b)(1): Identify the basis for federal jurisdiction (federal question under 28 U.S.C. § 1331, diversity under 28 U.S.C.

- 14 -

§ 1332, supplemental jurisdiction under *28 U.S.C. § 1367* on the basis that Defendant's alternative grounds for dismissal are without merit and fails as its alternative grounds.

d.   IN THE ALTERNATIVE, PLAINTIFF REQUESTS LEAVE TO AMEND

Should this Court find any deficiency in the Complaint, Plaintiff respectfully requests leave to amend pursuant to Federal Rule of Civil Procedure 15(a). Leave to amend should be freely given when justice so requires. *Somers v. Apple, Inc.*, 729 F.3d 953 (9th Cir. 2013). Amendment is particularly appropriate where, as here, as PLAINTIFF  has not peviously amended any alleged deficiency. Dismissal without leave to amend is proper only if it is clear that the complaint could not be saved by amendment. Somers v. Apple, Inc., 729 F.3d 953 (9th Cir. 2013). Defendant has not shown, and cannot show, that amendment would be futile. Plaintiff possesses additional factual allegations regarding [CATEGORIES OF ADDITIONAL FACTS] that would cure any pleading deficiency identified by the Court.

## CONCLUSION

 For the foregoing reasons, Plaintiff respectfully requests that this Court:

Deny Defendant's Motion to Dismiss in its entirety;

In the alternative, grant Plaintiff leave to amend the Complaint to cure any identified deficiency; and Grant such other and further relief as this Court deems just and proper.

Dated: [DATE]

Respectfully submitted,

Attorney for Plaintiff

**CERTIFICATE OF SERVICE**

I hereby certify that on [DATE], I served a true and correct copy of the foregoing PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS on all counsel of record via [METHOD OF SERVICE: ECF electronic filing / email / U.S. Mail]:

[DEFENSE COUNSEL NAME] [DEFENSE COUNSEL FIRM] [DEFENSE COUNSEL ADDRESS] [DEFENSE COUNSEL EMAIL]

[ATTORNEY NAME]

**PARTIES**

1.   Plaintiff **ASIA BROADBAND, INC ("AABB")** is a corporation formed under the laws of Nevada doing substantial business in this district. Plaintiff **Asia Broadband, Inc. ("AABB")** is a resource company engaged in digital asset development, precious metals operations, and technology-based financial services. During the Class Period, **AABB's** common stock traded publicly under the ticker symbol "**AABB"** on the OTC Markets and was damaged by Defendants' manipulative trading practices, which artificially suppressed AABB's stock price, impaired its ability to raise capital, distorted market valuation, and materially hindered its access to public equity financing.

2.        Defendant **VIRTU FINANCIAL INC. ("NITE")** is a corporation formed under the laws of New York with a principal place of business in New York. **NITE** (Knight Capital / Virtu Financial) is one of the largest OTC market-making entities in the United States. NITE is registered with the SEC as a broker-dealer and maintains operations in New York and New Jersey. NITE places and executes trades for both its customers and for its own proprietary trading accounts. During the Class Period, NITE dominated AABB's Level-2 order book, frequently controlling the highest percentage of visible bid and ask depth, and was a primary executor of the spoofing, bid layering, wash

trading, and naked short selling described herein.

3.	Defendant **GTS SECURITIES ("GTSM")** is a corporation formed under

the laws of New York with a principal place of business in New York.

4.	Defendant **G1 EXECUTION SERVICES, LLC** is a corporation formed

under the laws of Illinois with a principal place of business in New York.

## JURISDICTION AND VENUE

5.	This Court has subject matter jurisdiction over this action pursuant to 28

USCS § 1331 and 15 USCS § 78a because this action arises under the Securities

Exchange Act of 1934 and the rules and regulations promulgated thereunder, including

Rule 10b-5 and Sections 9(a)(2) and 9(e).

6.	Venue is proper in this district pursuant to 15 USCS § 78aa as the Defendants

transact substantial business and/or events constituting the violations alleged herein

occurred in this district.

## STATEMENT OF FACTS

7.	Plaintiff is a Nevada corporation that owns and trades securities on national

securities exchanges in this district.

8.	Defendants engaged in a pattern and practice of market manipulation tactics

designed to artificially influence the price of securities owned or traded by plaintiff

9.	Defendants engaged in "spoofing" by placing orders to buy or sell

securities

with the intent to cancel the orders before execution, thereby creating false impressions

about supply and demand.

10.     Defendants engaged in "bid layering" by placing multiple limit orders at different price levels away from the inside market, creating the false appearance of market depth and liquidity.

11.     Defendants engaged in "wash trading" by simultaneously or nearly simultaneously buying and selling the same securities, creating the false appearance of market activity while resulting in no change in beneficial ownership.

12.     Defendants colluded with other market participants to coordinate trading activities designed to manipulate securities prices.

13.     Defendant engaged in "naked short selling" by selling securities short without first borrowing or arranging to borrow the securities, and subsequently failing to deliver the securities when required.

14.     Defendant engaged in "quote stuffing" by placing and quickly canceling large numbers of orders in rapid succession, overwhelming market systems and creating artificial volatility.

15.     Defendant engaged in "micro stuffing" by placing and quickly canceling small orders in rapid succession to create false impressions of market activity.

16.     Defendant's manipulative activities were conducted through the use of interstate commerce and national securities exchanges.

17.     Defendant's manipulative activities were conducted with the intent to artificially influence securities prices and to induce other market participants,

including

plaintiff, to trade based on false market information.

18.      As a direct and proximate result of defendant's manipulative activities, plaintiff purchased and/or sold securities at artificially inflated and/or depressed prices.

19.      Plaintiff has suffered substantial financial losses as a result of defendant's manipulative activities.

20.      Plaintiff Asia Broadband, Inc. ("AABB" or "Plaintiff"), by and through its undersigned counsel, brings this action under Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder, on behalf of itself and all other similarly situated persons who sold AABB common stock between February 1, 2021 and December 31, 2025 and were damaged thereby.

21.      Plaintiff alleges the following based upon personal knowledge as to its own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which includes, among other things: review and analysis of Level-2 trading video archives; contemporaneous trade tape data; market microstructure analysis; public disclosures; academic research relating to spoofing, wash trading, and market-maker manipulation; and statistical evidence of manipulative order-flow behavior by Defendants GTSM and NITE during the Class Period. Plaintiff's

- 20 -

investigation is ongoing and substantial additional evidentiary support is expected to exist

for the allegations herein after a reasonable opportunity for discovery.

**PRELIMINARY STATEMENT**

22.      This federal securities   action arises from  Defendants' persistent, coordinated, and illegal manipulation of the market for AABB common stock throughout the Class Period. For nearly five years, Defendants GTSM (GTS Securities) and VIRTU/NITE (NITE/Knight/Virtu) engaged in a continuous pattern of spoofing, wash trading, bid layering, collusion,     naked short  selling, and artificial    order-book manipulation, all designed to suppress the price of AABB stock and distort the true appearance of supply, demand, and market depth.

23.      Defendants—two of the largest OTC market makers in the United States—systematically injected false signals into the Level-2 order book through non-bona fide bids and offers, fleeting quote flashes, multi-layered bid walls, wash-trade clusters, and synchronized algorithmic rotations across both sides of the market. These deceptive practices artificially depressed AABB's share price a and materially impaired the Company's financing ability, valuation, market reputation, liquidity, and access to Capital markets, including uplisting and institutional participation.

24.      As documented in extensive Level-2 video recordings and contemporaneous trade-tape analysis, Defendants repeatedly placed large visible orders that they had no intention of executing—frequently flashing, adjusting,

- 21 -

withdrawing, or relocating them within fractions of a second. These spoofing and layering events were executed with high-frequency precision, often in lockstep between GTSM and NITE, and consistently served to cap upward price momentum, fade buying interest, and induce downward pressure

through artificial depth and false liquidity signals.

## II.   SUMMARY OF THE FRAUD

### A.  AABB BUSINESS BACKGROUND

25.     Founded in 1996, Asia Broadband, Inc. ("AABB") is a resource company focused on precious metals production, digital asset development, and technology-backed financial services. AABB is the issuer and operator of the AABB Gold ("AABBG") digital token and maintains mining, refining, and metals-based operations in Mexico and Asia. Throughout the Class Period, AABB relied on public capital markets to support its growth initiatives, including mine expansion, digital asset development, and strategic acquisitions.

26.     AABB's common stock traded publicly on the OTC Markets under the

ticker "AABB". Due to the Company's development-stage posture and industry sector,

fair market valuation and access to equity financing were directly dependent on

transparent, lawful market conditions. Defendants' manipulative activities materially

distorted these conditions, depressing AABB's market capitalization, impairing access to

capital, and damaging the Company's ability to execute its business strategy.

**UNDER FEDERAL SECURITIES REGULATIONS, DEFENDANTS HAVE A DUTY, AS**

**MARKET "GATEKEEPERS," TO MONITOR ORDER FLOW AND TO REFRAIN FROM FACILITATING OR EXECUTING ILLEGAL TRADES**

27. Investors in OTC securities cannot independently place orders directly into the marketplace; they must route their trades through market-making broker-dealers such as GTSM and NITE. As registered broker-dealers, Defendants serve as the principal "gatekeepers" to market integrity, controlling execution quality, order routing, and the appearance of supply and demand in the Level-2 order book.

28. Regulators—including the SEC, FINRA, and the CFTC—require market makers to monitor order flow for manipulative activity and to prevent the placement,

acceptance, or facilitation of illegal trades, including spoofing, wash trading, layering, and

naked short selling. These obligations apply both to trades executed for customers and to

trades placed for Defendants' own proprietary accounts.

29.     Specifically, the SEC's Market Access Rule, 17 C.F.R. § 240.15c3-5, requires broker-dealers to establish and maintain systems reasonably designed to prevent manipulative or improper trading activity, including erroneous orders, algorithmic abuses, and illicit high-frequency activity.

30.     FINRA Rule 3110 imposes additional supervisory responsibilities, mandating that broker-dealers maintain systems capable of detecting and preventing manipulative or fraudulent activity, including layered orders, wash-trade cycles, and repeated non-bona fide quote placement.

31.     As detailed below, regulators have previously warned Defendants that their systems, controls, and high-frequency quoting practices were vulnerable to abuse and had, in fact, been used to facilitate unlawful trading activity. Despite these warnings, Defendants continued to engage in— and benefit from—precisely the forms of manipulation prohibited by federal law.

**III.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

32.      Beginning in early June 2025, GTSM repeatedly engaged in dual-side spoofing, flashing large bid and ask sizes without execution intent. In the June 23, 2025 recording, GTSM's bid at $0.0306 rapidly jumped from 154,000 to 224,000 shares within seconds—yet no corresponding      trades executed against this liquidity. Simultaneously, NITE adjusted its ask levels in rapid succession (e.g., $0.0332 during frames 94-145s). repeatedly blocking upward movement while pulling its quote the moment buyers approached.

33.      During June and July 2025—a period marked by increased retail interest, expanded corporate disclosures by AABB, and heightened trading volume—Defendants GTSM and NITE executed a concentrated campaign of manipulative trading designed to suppress the price of AABB common stock. Across multiple Level-2 video recordings, Defendants' activity in this period represents one of the clearest and most egregious clusters of spoofing, bid layering, wash trading, and collusive order-book behavior in the Class Period.

34.      Across hundreds of sessions, Defendants repeatedly inundated the Level-2 order book with large bursts of non-bona fide orders—often flashing hundreds of thousands of shares at multiple price levels—only to cancel them when the price approached or buying pressure emerged. These "Spoofing Episodes" occurred throughout the Class Period, frequently multiple times per hour.

35.        Defendants placed these spoofing and layered orders either (a) for their own proprietary benefit, or (b) while knowingly or recklessly facilitating manipulative trades from affiliated accounts or coordinated traders. Their high-frequency systems allowed real-time alterations of displayed depth, enabling Defendants to exploit microsecond reaction times unavailable to ordinary investors.

36.        Defendants intensified these tactics into July 2025. In the July 2025 video, GTSM repeatedly adjusted its bid at $0.0262, increasing its displayed size from 16,000 to 50,000 shares during volume builds at approximately 56,000 shares—only to pull back entirely once the upward pressure subsided. NITE simultaneously layered asks in the $0.0294–$0.0300 range, padding resistance levels and preventing natural price discovery.

37.    These June–July 2025 sequences illustrate a coordinated strategy: Defendants repeatedly built multi-level spoofing structures on both sides of the book, synchronized their layer rotations, injected artificial selling and resistance behavior through wash trades, and reversed upward momentum during critical periods of natural demand.

38.    This June–July 2025 cluster a broader pattern repeating across the Class Period: Defendants achieved short-term and long-term control of the Level-2 environment through spoofing, wash trading, and bid layering, thereby suppressing AABB's market price for their own financial advantage.

39.    In December 2025, Defendants GTSM and NITE engaged in another intense cluster of spoofing, bid layering, and coordinated wash trading, as captured in multiple pre- market and intraday Level-2 videos. This period reflects one of the most

blatant and synchronized sequences of manipulation in the Class Period, marked by rapid quote flashing, artificial depth creation, and dual-side suppression tactics.

40.     In the December 2025 pre-market video, GTSM repeatedly flashed large bid sizes—most notably increasing its displayed interest at $0.0131 from 10,000 shares to over 100,000 shares within seconds—despite no corresponding execution interest. These bid flashes appeared moments before clusters of micro-sell prints, including 23-share, 47-share, and 100-share lots at $0.0139, suggesting coordinated efforts to create the appearance of steady selling pressure.

41.     During this same period, GTSM allegedly engaged in ask-side spoofing by flashing 20,000-share walls at $0.0147 and $0.0200. Those displayed orders allegedly disappeared as buying activity approached, supporting the inference that they were not genuine liquidity. Rather, Plaintiff alleges that the fleeting orders were intended to create artificial resistance and cap upward momentum.

42.     GTSM acted in close coordination with NITE throughout this pre-market sequence. GTSM frequently layered bids in the $0.0131–$0.0134 band, while also flashing asks in the $0.0144–$0.0148 range, mirroring NITE's rotations. These synchronized adjustments created a persistent artificial ceiling, preventing price elevation beyond short-term micro-bounces

43.     The December 2025 intraday video reveals an even more aggressive pattern. In the opening minutes, GTSM's bid at $0.0136 spikes from 100,000 to 200,000 shares despite minimal genuine sell-side pressure and yet executes almost no volume at those levels. This confirms the orders were non-genuine and intended solely to manipulate perceived depth.

44.     As a result of Defendants' manipulative conduct during December 2025,

AABB experienced sharp, repeated intraday reversals and failed breakouts that were inconsistent with normal market dynamics. These effects directly harmed AABB by:

- depressing market price during periods of natural demand,
- distorting the perceived risk profile and liquidity of AABB stock,
- suppressing valuation critical to financing negotiations, and
- impairing the Company's ability to raise capital under fair, non-manipulated conditions.

45.    The December 2025 sequences further illustrate the persistent pattern of collusion between GTSM and NITE, the use of advanced HFT-style quoting tactics to manipulate price, and the ongoing deployment of spoofing and wash trading to distort the market for AABB common stock.

46.    A third major cluster of manipulative trading occurred between July 2025 and late December 2025, during which GTSM and NITE intensified their coordinated suppression of AABB's market price. This period includes the July 2025 Level-2 video, the December 2025 pre-market footage, and the December 2025 intraday session— each demonstrated the same hallmark patterns of quote manipulation, layering, and artificial selling pressure.

47.    In the July 2025 video, NITE repeatedly manipulated the lower bid band at $0.0262, oscillating its displayed size from 16,000 to 50,000 shares during modest volume surges (~56,000 shares). These adjustments were not tied to legitimate supply; rather, they were timed perfectly to fade upward momentum and induce micro-

reversals. GTSM simultaneously reinforced these suppressive tactics by layering asks in the $0.0294–$0.0300 range, padding overhead resistance and preventing the price from breaking above natural buying pressure.

48.     The pattern resurfaced—more aggressively—in the December 2025 pre-market session, where GTSM flashed large bids at $0.0131 (including bursts to 100,000 + shares) only to withdraw them instantly as the price approached. These spoofed bids were paired with synchronous ask flashes at $0.0144–$0.0148, creating a tightly controlled artificial channel that forced price stagnation and discouraged legitimatecounterparties from trading into the manipulated book.

49.     NITE played an active role in maintaining these channels by repeatedly layering bid stacks in the $0.0131–$0.0135 band and ask walls in the $0.0144–$0.0150 band. These layers collapsed or vanished as soon as the market probed for execution—confirming they served no economic purpose other than to signal false depth.

50.     The December 2025 intraday video revealed even clearer evidence of coordinated manipulation. GTSM dramatically increased its displayed bid at $0.0136 from 100,000 to 200,000 shares, despite minimal actual sell volume at that level. These bids evaporated seconds later, demonstrating they were spoofed solely to absorb upward pressure and redirect momentum downward.

51.     Simultaneously, GTSM orchestrated a series of rapid-fire ask-layer flashes— each in the 50,000 to 100,000 share range—strategically timed to coincide with buying attempts. These flashes artificially capped the price and were withdrawn at the moment buying interest subsided. This "probe-and-fade" technique is a common spoofing hallmark used by high-frequency traders to mislead investors about market strength.

52.    Tape analysis from this July–December period further reveals a high incidence of wash trades, including multiple examples of identical share quantities executing at identical timestamps with no intervening third-party prints. These synthetic prints created manufactured volume, amplified the illusion of persistent selling pressure, and contributed to Defendants' scheme to depress AABB's price.

53.    Despite positive Company developments during this period—including sustained digital-asset development, operational updates from mining activity, and increased retail investor engagement—the market repeatedly failed to reflect organic demand. Instead, AABB experienced forced reversals, failed breakouts, and prolonged price suppression directly correlated with bursts of spoofing and wash trading by GTSM and NITE.

54.    The combined July–December 2025 cluster demonstrates a consistent pattern: Defendants systematically manipulated both sides of the book, deployed non-bona fide orders, and coordinated wash trades to distort the true buying and selling interest in AABB. These practices materially harmed AABB by suppressing valuation, reducing liquidity, impairing financing opportunities, and deterring natural market participants.

55.    Viewed collectively, the patterns in July 2025, December 2025 pre-market, and December 2025 intraday recordings confirm Defendants' sustained and intentional manipulation of AABB's market price, with effects that extended far beyond isolated sessions and permeated the entire trading period.

56.    In reality, Defendants' malfeasance dates back to 2021 and Plaintiff has the historical data to back it up. In subsequent pleadings Plaintiff is prepared to show long-term quantitative data that exhibits what is explained in detail below. Defendants' engaged in a structured, coordinated effort to collude and manipulate the

Plaintiff's stock. This was a multi-year structural shorting/suppression scheme conducted by the same small group of market makers handling the most volume of the trading.

### Statement 1: Early June 2025 GTSM Dual-Side Spoofing

57.    Beginning in early June 2025, GTSM repeatedly engaged in dual-side spoofing, flashing large bid and ask sizes without execution intent. In the June 23, 2025 recording [Exhibit 1], NITE's bid at $0.0306 rapidly jumped from 154,000 to 224,000 shares within seconds—yet no corresponding execution occurred against this liquidity. Simultaneously, NITE adjusted its ask levels in rapid succession (e.g., $0.0332 during frames 94–145s), repeatedly blocking upward movement while pulling its quote the moment buyers approached.

### Statement 2: June and July 2025 Coordinated Suppression by GTSM and NITE

58.    During June and July 2025—a period marked by increased retail interest ,

expanded corporate disclosures by AABB, and heightened trading volume—Defendants GTSM and NITE executed a concentrated campaign of manipulative trading designed to suppress the price of AABB common stock. Across multiple Level-2 video recordings [Exhibits 2, 3, 4, 5, 6, 7], Defendants' activity in this period represents one of the clearest and most egregious clusters of spoofing, bid layering, wash trading, and collusive order-book behavior in the Class Period.

### Statement 3: July to December 2025 Intensified Manipulation Cluster

59.    A third major cluster of manipulative trading occurred between July 2025 and late December 2025, during which GTSM and NITE intensified their coordinated suppression of AABB's market price. This period includes the July 2025 Level-2

video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16]—each demonstrating the same hallmark patterns of quote manipulation, layering, and artificial selling pressure.

### Statement 4: Non-Bona Fide Orders and Spoofing Episodes Across Sessions

60.     Across hundreds of sessions, Defendants repeatedly inundated the Level-2 order book with large bursts of non-bona fide orders—often flashing hundreds of thousands of shares at multiple price levels—only to cancel them when the price approached or buying pressure emerged. These "Spoofing Episodes" occurred throughout the Class Period, frequently multiple times per hour, as documented in the June to December 2025 recordings [Exhibits 1–20].

### Statement 5: Defendants 'Proprietary or Facilitated Manipulative Trades

61.     Defendants placed these spoofing and layered orders either (a) for their own proprietary benefit, or (b) while knowingly or recklessly facilitating manipulative trades from affiliated accounts or coordinated traders. Their high-frequency systems allowed real-time alterations of displayed depth, enabling Defendants to exploit microsecond reaction times unavailable to ordinary investors, as seen in the coordinated quote behaviors across the reviewed sessions [Exhibits 1–20].

### Statement 6: Intensified Tactics in July 2025

62.     Defendants intensified these tactics into July 2025. In the July 2025 video [Exhibit 7], GTSM repeatedly adjusted its bid at $0.0262, increasing its displayed size from 16,000 to 50,000 shares during volume builds at approximately 56,000 shares—only to pull back entirely once the upward pressure subsided. NITE simultaneously layered asks in the $0.0294–$0.0300 range, padding overhead resistance and preventing natural price discovery.

## Statement 7: Coordinated Strategy in June–July 2025

63.     These June–July 2025 sequences illustrate a coordinated strategy: Defendants repeatedly built multi-level spoofing structures on both sides of the book, synchronized their layer rotations, injected artificial selling and resistance behavior through wash trades, and reversed upward momentum during critical periods of natural demand, as evidenced in the analyzed recordings [Exhibits 2–7]

## Statement 8: December 2025 Intensified Spoofing and Layering by GTSM and NITE

64.     In December 2025, Defendants GTSM and NITE engaged in another intense cluster of spoofing, bid layering, and coordinated wash trading, as captured in multiple pre-market and intraday Level-2 videos [Exhibits 15, 16, 19]. This period reflects one of the most blatant and synchronized sequences of manipulation in the Class Period, marked by rapid quote flashing, artificial depth creation, and dual-side suppression tactics.

## Statement 9: December 2025 Pre-Market Bid Spoofing by GTSM

65.     In the December 2025 pre-market video [Exhibit 15], GTSM repeatedly flashed 22 large bids at $0.0131 (including bursts to 100,000+ shares) only to withdraw them instantly as the price approached. These spoofed bids were paired with synchronous ask flashes at $0.0144–$0.0148, creating a tightly controlled artificial channel that forced price stagnation and discouraged legitimate counterparties from trading into the manipulated book.

## Statement 10: GTSM Coordination with NITE in December 2025 Pre-Market

66.    GTSM acted in close coordination with NITE throughout this pre-market sequence [Exhibit 15]. GTSM frequently layered bids in the $0.0131–$0.0134 band, while also flashing asks in the $0.0144–$0.0148 range, mirroring NITE's rotations. These synchronized adjustments created a persistent artificial ceiling, preventing price elevation beyond short-term micro-bounces.

### Statement 11: December 2025 Intraday Bid Spoofing by GTSM

67.    The December 2025 intraday video [Exhibit 16] reveals an even more aggressive pattern. In the opening minutes, GTSM dramatically increased its displayed bid at $0.0136 from 100,000 to 200,000 shares, despite minimal actual execution at that level. These bids executed almost no volume and were withdrawn seconds later, demonstrating they were spoofed solely to absorb upward pressure and redirect momentum downward.

### Statement 12: GTSM Ask Spoofing in December 2025 Intraday

68.    Simultaneously in the December 2025 intraday session [Exhibit 16], GTSM orchestrated a series of rapid-fire ask-layer flashes—each in the 50,000 to 100,000 share range—strategically timed to coincide with buying attempts. These flashes artificially capped the price and were withdrawn at the moment buying interest subsided. This "probe-and-fade" technique is a common spoofing hallmark used by high-frequency traders to mislead investors about market strength.

### Statement 13: Wash Trades in July–December 2025

69.    Tape analysis from this July–December period further reveals a high incidence of wash trades, including multiple examples of identical share quantities executing at identical timestamps with no intervening third-party prints. These synthetic prints created manufactured volume, amplified the illusion of persistent selling pressure,

and contributed to Defendants' scheme to depress AABB's price, as documented in the analyzed sessions [Exhibits 7, 15, 16].

### Statement 14: Impact of Manipulation on AABB During July–December

70.     Despite positive Company developments during this period—including sustained digital-asset development, operational updates from mining activity, and increased retail investor engagement—the market repeatedly failed to reflect organic demand. Instead, AABB experienced sharp, repeated intraday reversals and failed breakouts that were inconsistent with normal market dynamics, as shown in the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16].

### Statement 15: Harm to AABB from Defendants' Conduct

71.     These manipulative practices directly harmed AABB by: depressing market price during periods of natural demand, distorting the perceived risk profile and liquidity of AABB stock, suppressing valuation critical to financing negotiations, and impairing the Company's ability to raise capital under fair, non-manipulated conditions, as evidenced across the June to 10 December 2025 recordings [Exhibits 1–20].

### Statement 16: Consistent Pattern in December 2025 Sessions

72.     The December 2025 sequences further illustrate the persistent pattern of collusion between GTSM and NITE, the use of advanced HFT-style quoting tactics to manipulate price, and the ongoing deployment of spoofing and wash trading to distort the market for AABB common stock, as captured in the pre-market and intraday sessions [Exhibits 15, 16].

### Statement 17: Combined July–December 2025 Cluster of Manipulation

73. The combined July–December 2025 cluster demonstrates a consistent pattern: 18 Defendants systematically manipulated both sides of the book, deployed non-bona fide orders, and coordinated wash trades to distort the true buying and selling interest in AABB. These practices materially harmed AABB by suppressing valuation, reducing liquidity, impairing financing opportunities, and deterring natural market participants, as documented in the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16].

### Statement 18: Collective Impact Across Sessions

74. Viewed collectively, the patterns in July 2025, December 2025 pre-market, and December 2025 intraday recordings confirm Defendants' sustained and intentional manipulation of AABB's market price, with effects that extended far beyond isolated sessions and permeated the entire trading period, as evidenced in the analyzed exhibits [Exhibits 7, 15, 16].

### CLAIMS FOR RELIEF

### COUNT I - Violation of Rule 10b-5

### (Against All Defendants)

75. Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 74 as if fully set forth herein.

76. Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of Securities and Exchange Commission rules. Thompson v. Paul, 547 F.3d 1055 (9th Cir. 2008). Rule 10b-5implements Section 10(b) and makes it unlawful to employ any device, scheme, or

artifice to defraud, to make any untrue statement of a material fact or to omit to state a material fact necessary to make statements not misleading, or to engage in any act, practice, or course of business which operates as fraud or deceit upon any person, in connection with the purchase or sale of any security.

77.    Nevada has enacted securities laws under NRS 90.570(2) and (3) that address securities fraud in state enforcement actions. Sec'y of State v. Tretiak, 117 Nev. 299, 22 P.3d 1134 (2001). The Nevada Uniform Securities Act must be applied and construed to effectuate its general purpose to make uniform the law with respect to securities among states enacting it and to coordinate the interpretation and administration with related federal laws and regulations. Sec'y of State v. Tretiak, 117 Nev. 299, 22 P.3d 1134 (2001).

78.    Rule 10b-5, promulgated under the Securities Exchange Act of 1934, establishes the elements of securities fraud in federal law. These elements generally include: (1) a material misrepresentation or omission, (2) made with scienter (intent or knowledge of wrongdoing), (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff relied, and (5) that caused the plaintiff's damages.

79.    Plaintiff alleges the following elements (1) a material misrepresentation or omission, (2) made with scienter (intent or knowledge of wrongdoing), (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff relied, and (5) that caused the plaintiff's damages.

80.    Plaintiff alleges that Defendants allege that, directly or indirectly, by the use of means or instrumentalities of interstate commerce, or of the mails, or of a facility of a

national securities exchange, used or employed manipulative and deceptive devices or contrivances in connection with the purchase or sale of securities. s.

81. Defendants engaged in spoofing, bid layering, wash trading, collusion, naked short selling, quote stuffing, and micro stuffing, all of which constitute manipulative and deceptive devices or contrivances. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, electronic trading networks, and the facilities of national securities markets.

82. Defendant acted with scienter, that is, with intent to deceive, manipulate, or defraud.

83. Defendant's manipulative activities were designed to create false impressions of market activity and to artificially influence securities prices.

84. Defendant's manipulative activities were in connection with the purchase or sale of securities.

85. Defendant's manipulative activities affected securities that were purchased or sold by plaintiff.

86. Plaintiff reasonably relied on the integrity of the market when making investment decisions.

87. Plaintiff would not have purchased or sold securities at the prices it did had it known of defendant's manipulative activities.

88. Plaintiff suffered economic loss as a result of defendant's manipulative activities.

- 38 -

89.    Plaintiff purchased securities at artificially inflated prices and/or **sold securities** at artificially depressed prices, resulting in financial losses.

90.    Defendant's manipulative activities were designed to create false impressions of market activity and to artificially influence securities prices, as the coordinated spoofing, layering, quote stuffing, tape painting, and sell dominance created deceptive depth, volume, and momentum signals across the analyzed sessions [Exhibits1–20].

91.    Defendant's manipulative activities were in connection with the purchase or sale of securities, as the tactics directly distorted the order book and execution environment during active trading periods in the June to December 2025 recordings [Exhibits 1–20].

92.    Defendant's manipulative activities affected securities that were purchased or sold by plaintiff, as the artificial pinning and resets impacted all trades in the reviewed AABB sessions [Exhibits 1–20].

93.    Plaintiff reasonably relied on the integrity of the market when making investment decisions, as the manipulated Level II and tape presented false liquidity and demand signals that appeared as normal market conditions in the analyzed exhibits [Exhibits 1–20].

94.    Plaintiff would not have purchased or sold securities at the prices it did had it known of defendant's manipulative activities, as the spoofed depth, layered resistance, and synthetic sells created distorted pricing not reflective of true supply/demand in the sessions [Exhibits 1–20].

95.    Plaintiff suffered economic loss as a result of defendant's manipulative activities, as trading occurred at prices suppressed by the documented tactics across the period [Exhibits 1–20].

96.    Plaintiff purchased securities at artificially inflated prices and/or sold securities at artificially depressed prices, resulting in financial losses, as the persistent downward bias and failed breakouts despite buy volume led to unfavorable executions in the June to December 2025 data [See Exhibits 1–20].

**UNDER FEDERAL SECURITIES REGULATIONS, DEFENDANTS HAVE A DUTY, AS MARKET "GATEKEEPERS," TO MONITOR ORDER FLOW AND TO REFRAIN FROM FACILITATING OR EXECUTING ILLEGAL TRADES**

97.    Investors in OTC securities cannot independently place orders directly into the marketplace; they must route their trades through market-making broker-dealers suchas GTSM and NITE. As registered broker-dealers, Defendants serve as the principal"gatekeepers" to market integrity, controlling execution quality, order routing, and the appearance of supply and demand in the Level-2 order book.

98.     Regulators—including the SEC, FINRA, and the CFTC—require market makers to monitor order flow for manipulative activity and to prevent the placement, acceptance, or facilitation of illegal trades, including spoofing, wash trading, layering, and naked short selling. These obligations apply both to trades executed for customers and to trades placed for Defendants' own proprietary accounts.

99.    Specifically, the SEC's Market Access Rule, 17 C.F.R. § 240.15c3-5,requires broker-dealers to establish and maintain systems reasonably designed to prevent

manipulative or improper trading activity, including erroneous orders, algorithmic abuses, and illicit high-frequency activity.

100.   FINRA Rule 3110 imposes additional supervisory responsibilities, mandating that broker-dealers maintain systems capable of detecting and preventing manipulative or fraudulent activity, including layered orders, wash-trade cycles, and repeated non-bona fide quote placement.

101.   As detailed below, regulators have previously warned Defendants that their systems, controls, and high-frequency quoting practices were vulnerable to abuse and had, in fact, been used to facilitate unlawful trading activity. Despite these warnings, Defendants continued to engage in— and benefit from—precisely the forms of manipulation prohibited by federal law.

102.   Plaintiff's economic loss was caused by defendant's manipulative activities as Defendant's manipulative activities directly caused artificial price movements in the affected securities, which directly caused plaintiff's financial losses.

103.   Plaintiff alleges that Defendants conduct is the proximate cause of its damages.

**COUNT II - Violation of Section 9(a)(2) of the Securities Exchange Act**

**(Against All Defendants)**

104.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 103 as if fully set forth herein.

105.   The elements of a claim under Section 9(a)(2) are as follows:

A series of transactions in a security creating  actual or apparent active trading in that security, or raising or depressing the price of that security.

The transactions were carried out with scienter (intent or knowledge of wrongdoing).

The purpose of the transactions was to induce the purchase or sale of the security by others.

The plaintiff relied on the transactions.

The transactions affected the plaintiff's purchase or selling price.

106.   Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected a series of transactions in securities registered on a national securities exchange.

107.   Defendant engaged in spoofing, bid layering, wash trading, and other manipulative tactics involving securities registered on national securities exchanges.

108.   Plaintiff alleges the following transactions that are  attached and incorporated as Exhibit A.

109.   Defendant's transactions created actual or apparent active trading in the securities.

110.   Defendant's manipulative activities created false impressions of market activity and liquidity.

111.   Plaintiff alleges that defendant's transactions as reflected in Exhibit A raised or depressed the price of the securities.

112.   Defendant's manipulative activities caused artificial price movements in the affected securities.

113.   At all times material, Plaintiff alleges that the factual allegations as stated

herein is the proximate cause of its damages as stated herein,

114. Defendant's transactions were conducted for the purpose of inducing others to purchase or sell the securities.

115. Defendant's manipulative activities were designed to induce other market participants, including plaintiff, to trade based on false market information.

116. Defendant acted willfully and intentionally in conducting these manipulative transactions.

117. Defendant knowingly and intentionally engaged in the manipulative activities described herein.

118. Defendant, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected a series of transactions in securities registered on a national securities exchange, as the coordinated manipulative order placements and executions occurred through NASD/OTC facilities interconnected with interstate systems across the analyzed sessions [Exhibits 1–20].

119. Defendant engaged in spoofing, bid layering, wash trading, and other manipulative tactics involving securities registered on national securities exchanges, as repeatedly documented in the rapid non-bona fide order placements, layered stacks, matched clusters, and micro-lot probing in the trade tapes and Level II videos [Exhibits 1– 20].

120. Plaintiff alleges the following transactions that are attached and incorporated as Exhibit A [Exhibits 1–20].

121. Defendant's transactions created actual or apparent active trading in the securities, as the artificial volume from wash trades and spoofed depth generated misleading signals of activity in the reviewed sessions [Exhibits 1–20].

122. Defendant's manipulative activities created false impressions of market activity and liquidity, as the illusory order book and synthetic prints distorted perceived demand/supply across the June to December 2025 recordings [Exhibits 1–20].

123. Plaintiff alleges that defendant's transactions as reflected in Exhibit A raised or depressed the price of the securities, as the coordinated dumps and layered resistance caused artificial resets and pinning despite buy pressure [Exhibits 1–20].

124. Defendant's manipulative activities caused artificial price movements in the affected securities, as evidenced by the failed breakouts and engineered fades in the analyzed exhibits [Exhibits 1–20].

125. At all times material, Plaintiff alleges that the factual allegations as stated herein is the proximate cause of its damage as stated herein, as the manipulative tactics directly led to suppressed valuation and unfavorable trading conditions in the sessions [Exhibits 1–20].

126. Defendant's transactions were conducted for the purpose of inducing others to purchase or sell the securities, as the deceptive quoting and volume signals were designed to mislead market participants into trading at manipulated levels [Exhibits 1–20].

127. Defendant's manipulative activities were designed to induce other market

participants, including plaintiff, to trade based on false market information, as the spoofed  depth and layered walls created illusions prompting reactions in the reviewed data [Exhibits 1–20].

128.   Defendant acted willfully and intentionally in conducting these manipulative transactions, as the systematic and recurring nature of the tactics across months indicates deliberate execution [Exhibits 1–20].

129.   Defendant knowingly and intentionally engaged in the manipulative activities described herein, as the coordinated synchronization and precise timing in the Level II videos and tapes demonstrate purposeful manipulation [Exhibits 1–20].

**COUNT III - Violation of Section 9(e) of the Securities Exchange Act**

**(Against All Defendants)**

130.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 129 as if fully set forth herein.

131.   Defendant violated Section 9 of the Securities Exchange Act through the manipulative activities described herein.

132.   Defendant engaged in spoofing, bid layering, wash trading, and other manipulative tactics prohibited by Section 9.

133.   Plaintiff alleges that the transactions listed on Exhibit B violated Section 9(e) of the Securities Act

134.   Plaintiff purchased or sold securities at prices affected by defendant's manipulative activities.

135.   Plaintiff traded securities whose prices were artificially inflated or depressed as a result of defendant's manipulative activities.

136.   Plaintiff suffered damages as a result of defendant's manipulative activities.

137.   Plaintiff incurred financial losses by trading securities at artificially inflated or depressed prices.

138.   Plaintiff alleges that Defendant's violations of Section 9 caused plaintiff's damages.

139.   Plaintiff's financial losses were directly caused by the artificial price movements resulting from defendant's manipulative activities.

140.   Defendant violated Section 9 of the Securities Exchange Act through the manipulative activities described herein, as the coordinated spoofing, layering, quote stuffing, tape painting, and wash trading patterns across the June 24 to December 26, 2025 sessions constitute a series of acts or practices to induce purchases/sales via Deceptive devices [Exhibits 1–20].

141.   Defendant engaged in spoofing, bid layering, wash trading, and other manipulative tactics prohibited by Section 9, as repeatedly documented in the rapid non-bona fide order placements, layered stacks, matched buy/sell clusters, and micro-lot probing in the trade tapes and Level II videos [Exhibits 1–20].

142.   Plaintiff alleges that the transactions as listed on Exhibit B violated Section 9(e) of the Securities Exchange Act, as the specific instances of spoofing, layering, and wash trades in the analyzed sessions directly induced trading through false market signals [Exhibits 1–20].

143.   Plaintiff purchased or sold securities at prices affected by defendant's manipulative activities, as the artificial pinning, failed breakouts, and downward

resets despite retail buy surges directly influenced execution levels in the June to December 2025 data [Exhibits 1–20].

144.   Plaintiff traded securities whose prices were artificially inflated or depressed as a result of defendant's manipulative activities, as evidenced by the suppressed ranges and sell dominance overriding demand in the reviewed recordings [Exhibits 1–20].

145.   Plaintiff suffered damages as a result of defendant's manipulative activities, as the distorted market conditions led to trading at manipulated prices across the sessions [Exhibits 1–20].

146.   Plaintiff incurred financial losses by trading securities at artificially inflated or depressed prices, as the engineered fades and pinning caused execution at unfavorable levels in the analyzed exhibits [Exhibits 1–20].

147.   Plaintiff alleges that Defendant's violations of Section 9 caused plaintiff's damages, as the manipulative tactics directly resulted in suppressed valuation and impaired fair trading in the June to December 2025 period [Exhibits 1–20].

148.   Plaintiff's financial losses were directly caused by the artificial price movements resulting from defendant's manipulative activities, as the spoofing, layering, and wash trades created false supply/demand signals leading to depressed prices in the documented sessions [Exhibits 1–20].

**COUNT IV - Market Manipulation through Spoofing and Bid Layering**

**(Against all Defendants)**

149.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1

- 47 -

through 148 as if fully set forth herein.

150.   Defendant placed orders to buy or sell securities with no intention to execute them.

151.   Defendant engaged in spoofing by placing and quickly canceling orders that it never intended to execute.

152.   Defendant engaged in bid layering by placing multiple limit orders at different price levels away from the inside market, with no intention of executing those orders.

153.   Defendant's spoofing and bid layering created false impressions of market activity.

154.   Defendant's activities created false impressions of supply and demand, market depth, and liquidity.

155.   Defendant's spoofing and bid layering induced others, including plaintiff, to trade based on those false impressions.

156.   Plaintiff and other market participants made trading decisions based on the false market information created by defendant's spoofing and bid layering.

157.   Defendant acted with scienter in conducting its spoofing and bid layering activities.

158.   Defendant knowingly and intentionally engaged in spoofing and bid layering to manipulate securities prices.

159.   Defendant's spoofing and bid layering caused damages to plaintiff.

160.   Plaintiff suffered financial losses by trading securities at artificially inflated

- 48 -

or depressed prices caused by defendant's spoofing and bid layering.

161.   Defendant placed orders to buy or sell securities with no intention to execute them, as evidenced by the rapid placement and cancellation of large bid and ask sizes in multiple sessions [Exhibits 1–20].

162.   Defendant engaged in spoofing by placing and quickly canceling orders that it never intended to execute, as observed in the June 23, 2025 recording where bid sizes at $0.0306 increased from 154,000 to 224,000 shares without corresponding execution [Exhibit 1], the July 2025 video where bid sizes at $0.0262 fluctuated from 16,000 to 50,000 shares [Exhibit 7], and the December 2025 pre-market and intraday sessions where bid and ask sizes were flashed and withdrawn [Exhibits 15, 16].

163.   Defendant engaged in bid layering by placing multiple limit orders at different price levels away from the inside market, with no intention of executing those orders, as shown in the June–July 2025 sequences where bid and ask layers were built and synchronized [Exhibits 2–7], and in the December 2025 recordings where layers were adjusted to create artificial depth [Exhibits 15, 16].

164.   Attached as **Exhibit C** are transactions that are SPECIFIC INSTANCES OF SPOOFING AND BID LAYERING [Exhibits 1, 7, 15, 16].

165.   Defendant's spoofing and bid layering created false impressions of market activity, as demonstrated in the patterns where non-bona fide orders misled market perception across the analyzed sessions [Exhibits 1–20].

166.   Defendant's activities created false impressions of supply and demand, market depth, and liquidity, as seen in the coordinated quote behaviors that distorted

the order book in the reviewed recordings [Exhibits 1–20].

167. Defendant's spoofing and bid layering induced others, including plaintiff, to trade based on those false impressions, as the manipulated market conditions influenced trading decisions in the June to December 2025 sessions [Exhibits 1–20].

168. Plaintiff and other market participants made trading decisions based on the false market information created by defendant's spoofing and bid layering, as evidenced by the repeated failed breakouts and price suppressions in the analyzed exhibits [Exhibits 1–20].

169. Attached is ADDITIONAL FACTUAL ALLEGATIONS REGARDING INDUCED TRADING. [Exhibits 1–20].

170. Defendant acted with scienter in conducting its spoofing and bid layering activities, as the intentional and recurring nature of the manipulations is clear in the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and The 4 December 2025 intraday session [Exhibit 16].

171. Defendant knowingly and intentionally engaged in spoofing and bid layering to manipulate securities prices, as demonstrated by the systematic patterns of non-bona fide orders and coordinated actions in the June 23, 2025, recording [Exhibit 1], the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and the December 2025 intraday session [Exhibit 16].

172. Attached are transactions that are SPECIFIC INSTANCES OF SPOOFING AND BID LAYERING [Exhibits 1, 7, 15, 16].

173. Defendant's spoofing and bid layering caused damages to plaintiff, as the

artificial price suppression led to financial losses across the analyzed sessions [Exhibits

1–20].

174.   Plaintiff suffered financial losses by trading securities at artificially inflated or depressed prices caused by defendant's spoofing and bid layering, as evidenced by the distorted market conditions and failed price movements in June to December 2025 recordings [Exhibits 1–20]

**COUNT V - Market Manipulation through Wash Trading**

**(Against all Defendants)**

175.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 177 as if fully set forth herein.

176.   Defendant engaged in transactions where there was no change in beneficial ownership.

177.   Defendant simultaneously or nearly simultaneously bought and sold the same securities, resulting in no change in beneficial ownership.

178.   Attached as Exhibit D is transactions that are SPECIFIC INSTANCES OF SPECIFIC WASH TRADES.

179.   Defendant's wash trading created false or misleading signals of trading activity.

180.   Defendant's wash trading created false impressions of market interest, liquidity, and trading volume.

181.   Attached as Exhibit E are transactions that are SPECIFIC INSTANCES OF SPECIFIC WASH TRADES.

182.   Defendant intended to create artificial market activity through its wash

trading.

183.   Defendant knowingly and intentionally engaged in wash trading to manipulate securities prices and market perceptions.

184.   Defendant's wash trading affected the price of securities.

185.   Defendant's artificial trading activity influenced the market price of the affected securities.

186.   Attached as **Exhibit F** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING PRICE EFFECTS.

187.   Defendant's wash trading caused damages to plaintiff.

188.   Plaintiff suffered financial losses by trading securities at artificially inflated or depressed prices caused by defendant's wash trading.

189.   Defendant engaged in transactions where there was no change in beneficial ownership, as evidenced by matched buy/sell clusters and synchronized micro-lot prints in multiple sessions [Exhibits 1–20].

190.   Defendant simultaneously or nearly simultaneously bought and sold the same securities, resulting in no change in beneficial ownership, as observed in the rapid counter-trades and identical quantity prints during momentum tests across the analyzed sessions [Exhibits 1–20].

191.   Attached as **Exhibit D** are transactions that are SPECIFIC INSTANCES OF SPECIFIC WASH TRADES [Exhibits 1, 7, 15, 16].

192.   Defendant's wash trading created false or misleading signals of trading activity, as shown in the micro-lot clusters and matched prints inflating volume without net change in the reviewed recordings [Exhibits 1–20].

193.   Defendant's wash trading created false impressions of market interest, liquidity, and trading volume, as demonstrated by synthetic prints and artificial depth in the June to December 2025 sessions [Exhibits 1–20].

194.   Attached as **Exhibit E** are transactions that are SPECIFIC INSTANCES OF SPECIFIC WASH TRADES [Exhibits 1, 7, 15, 16].

195.   Defendant intended to create artificial market activity through its wash trading, as the recurring patterns of non-bona fide matched trades indicate deliberate manipulation in the analyzed exhibits [Exhibits 1–20].

196.   Defendant knowingly and intentionally engaged in wash trading to manipulate securities prices and market perceptions, as evidenced by the systematic micro-lot probing and volume inflation in the July 2025 video [Exhibit 7], the December 2025 pre-market footage [Exhibit 15], and December 2025 intraday session [Exhibit16].

197.   Defendant's wash trading affected the price of securities, as the artificial volume and signals contributed to pinning and reversals in the reviewed sessions [Exhibits 1–20].

198.   Defendant's artificial trading activity influenced the market price of the affected securities, as shown in the failed breakouts and suppressed momentum despite retail buying in the June to December 2025 recordings [Exhibits 1–20].

199.   Attached as **Exhibit F** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING PRICE EFFECTS [Exhibits 1–20].

200.   Defendant's wash trading caused damages to plaintiff, as the distorted market conditions led to trading at manipulated prices across the analyzed sessions

[Exhibits 1–20].

201.   Plaintiff suffered financial losses by trading securities at artificially inflated or depressed prices caused by defendant's wash trading, as evidenced by the suppressed price action and failed momentum in the June to December 2025 exhibits [Exhibits 1–20].

## COUNT VI - Market Manipulation through Naked Short Selling

### (Against all Defendants)

202.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 204 as if fully set forth herein.

203.   Defendant sold securities short without borrowing or arranging to borrow them.

204.   Defendant engaged in naked short selling by selling securities short without having located shares to borrow.

205.   Attached as **Exhibit G** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING NAKED SHORT SELLING.

206.   Defendant failed to deliver securities within the required settlement period.

207.   Defendant's naked short sales resulted in failures to deliver securities when due.

208.   Defendant intended to manipulate the market through its naked short selling.

209.   Defendant knowingly and intentionally engaged in naked short selling to artificially depress securities prices.

210.   Defendant's naked short selling affected the price of securities.

- 54 -

211.   Defendant's naked short selling artificially depressed the price of the
affected securities.

212.   Defendant's naked short selling caused damages to plaintiff.

213.   Plaintiff suffered financial losses as a result of artificially depressed
securities prices caused by defendant's naked short selling.

214.   Defendant sold securities short without borrowing or arranging to borrow
them, as indicated by the persistent high short volume percentages (often 40–120%
of daily volume) and significant failures to deliver in prior periods, combined with sell
dominance absorbing retail buys without corresponding price lifts across the analyzed
sessions [Exhibits 1–20].

215.   Defendant engaged in naked short selling by selling securities short without
having located shares to borrow, as suggested by the extreme short volume ratios
exceeding total volume on certain days (e.g., up to 121% short percentage) and
historical FTD spikes unresolved in price action, allowing unlimited downside supply in
the reviewed trading patterns [Exhibits 1–20].

216.   Attached as **Exhibit G** are transactions that are SPECIFIC INSTANCES OF
ALLEGATIONS   REGARDING         NAKED   SHORT     SELLING   [Exhibits 1–20,
supplemented by FTD data showing peaks like 5,146,878 shares on August 7,
2025].

217.   Defendant failed to deliver securities within the required settlement period,
as evidenced by the documented FTD quantities totaling over 9 million shares across

multiple dates, correlating with periods of heavy sell pressure and price suppression [Exhibits 1–20].

218. Defendant's naked short sales resulted in failures to deliver securities when due, as shown in the FTD spikes (e.g., August 2025 totals ~8.35M shares) aligning with sessions of artificial downside volume overwhelming buys [Exhibits 1–20].

219. Defendant intended to manipulate the market through its naked short selling, as the recurring patterns of high short volume on momentum days and unresolved delivery  issues facilitated sustained price depression despite retail demand [Exhibits 1–20].

220. Defendant knowingly and intentionally engaged in naked short selling to artificially depress securities prices, as indicated by the systematic short dominance (e.g., 66–80% sells in high-volume sessions) and FTD history enabling downside resets in the 23 June to December 2025 recordings [Exhibits 1–20].

221. Defendant's naked short selling affected the price of securities, as the elevated short percentages and delivery failures contributed to pinning and downward pressure in the analyzed exhibits [Exhibits 1–20].

222. Defendant's naked short selling artificially depressed the price of the affected securities, as demonstrated by the failed breakouts and declining trend despite buy volume and company growth reports in the sessions reviewed [Exhibits 1–20].

223. Defendant's naked short selling caused damages to plaintiff, as the resulting

suppressed market conditions led to trading at lower manipulated prices across the period [Exhibits 1–20].

224.   Plaintiff suffered financial losses as a result of artificially depressed securities prices caused by defendant's naked short selling, as evidenced by the persistent downside bias and absorption of retail buys without upward reflection in the June to 8 December 2025 data [Exhibits 1–20].

**COUNT VII - Market Manipulation through Quote Stuffing and Micro Stuffing**

**(Against all Defendants)**

225.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 228 as if fully set forth herein.

226.   Defendant rapidly placed and canceled large numbers of orders.

227.   Defendant engaged in quote stuffing by placing and quickly canceling large numbers of orders in rapid succession.

228.   Defendant engaged in micro stuffing by placing and quickly canceling small orders in rapid succession.

229.   Attached as **Exhibit H** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING QUOTE STUFFING AND MICRO STUFFING.

230.   Defendant intended to overload market systems or create confusion through its quote stuffing and micro stuffing.

231.   Defendant knowingly and intentionally engaged in quote stuffing and micro stuffing to disrupt normal market operations.

232.   Defendant gained advantage through market delays or confusion caused by its quote stuffing and micro stuffing.

233.   Defendant exploited the market disruptions caused by its quote stuffing and micro stuffing to execute trades at favorable prices.

234.   Defendant's quote stuffing and micro stuffing affected the price of securities.

235.   Defendant's activities created artificial volatility and price movements in the affected securities.

236.   Defendant's quote stuffing and micro stuffing caused damages to plaintiff.

237.   Plaintiff suffered financial losses as a result of artificial price movements and market disruptions caused by defendant's quote stuffing and micro stuffing.

238.   Defendant rapidly placed and canceled large numbers of orders, as evidenced by the recurring rapid quote reloads and size fluctuations without full execution in the Level II videos across multiple sessions [Exhibits 1–20].

239.   Defendant engaged in quote stuffing by placing and quickly canceling large numbers of orders in rapid succession, as observed in the synchronized bid/ask reloads and unexecuted size bursts during volume spikes in the analyzed recordings [Exhibits 1–20].

240.   Defendant engaged in micro stuffing by placing and quickly canceling small orders in rapid succession, as demonstrated by the clusters of tiny trades (e.g., 1–888 shares at pivots) and micro-adjustments in the ladder during pinning periods [Exhibits 1–20].

241.   Attached as **Exhibit H** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS REGARDING QUOTE STUFFING ANDMICRO STUFFING [Exhibits 1–20].

242.   Defendant intended to overload market systems or create confusion through

its quote stuffing and micro stuffing, as the rapid non-bona fide order placements disrupted natural price discovery and created artificial depth in the reviewed sessions [Exhibits 1–20].

243.   Defendant knowingly and intentionally engaged in quote stuffing and micro stuffing to disrupt normal market operations, as shown in the systematic rapid reloads and  tiny pivot trades timed to fade momentum in the June to December 2025 videos [Exhibits1–20].

244.   Defendant gained advantage through market delays or confusion caused by its quote stuffing and micro stuffing, as the flooded book allowed absorption of buys without lift and execution of counters at favorable levels [Exhibits 1–20].

245.   Defendant exploited the market disruptions caused by its quote stuffing and micro stuffing to execute trades at favorable prices, as evidenced by the sell dominance  and price resets following buy clusters in the analyzed exhibits [Exhibits 1–20].

246.   Defendant's quote stuffing and micro stuffing affected the price of securities, as the artificial disruptions contributed to pinning and downward pressure despite retail volume [Exhibits 1–20].

247.   Defendant's activities created artificial volatility and price movements in the affected securities, as demonstrated by the failed breakouts and engineered fades in the sessions reviewed [Exhibits 1–20].

248.   Defendant's quote stuffing and micro stuffing caused damages to plaintiff, as the distorted market conditions led to trading at manipulated prices [Exhibits 1–20].

249.   Plaintiff suffered financial losses as a result of artificial price movements and market disruptions caused by defendant's quote stuffing and micro stuffing, as evidenced by the suppressed price action and absorbed buys in the June to December 2025 data [Exhibits 1–20].

### COUNT VIII - Violation of Nevada Securities Law

### (Against all Defendants)

250.   Plaintiff repeats and realleges the allegations set forth in paragraphs 1 through 253 as if fully set forth herein

251.   Nevada securities law prohibits specific conduct in connection with securities transactions. In connection with the offer to sell, sale, offer to purchase or purchase of a security, a person shall not, directly or indirectly: employ any device, scheme or artifice to defraud; make an untrue statement of a material fact or omit to state a material fact necessary in order to make the statements made not misleading in the light of the circumstances under which they are made; or engage in an act, practice or course of business which operates or would operate as a fraud or deceit upon a person. Nev. Rev. Stat. Ann. § 90.570. Nevada's blue sky laws parallel federal Rule 10b-5 requirements. *Sec'y of State v. Tretiak*, 117 Nev. 299, 22 P.3d 1134 (2001). The elements of a Rule 10b-5 claim are: (1) a misrepresentation or omission of a material fact, (2) reliance, (3) scienter, and (4) resulting damages. *Sec'y of State v. Tretiak,* 117 Nev. 299, 22 P.3d 1134 (2001).

252.   Defendant employed devices, schemes, and  artifices to defraud in connection with the offer, sale, or purchase of securities.

253.   Defendant engaged in spoofing, bid layering, wash trading, naked short

selling, quote stuffing, and other manipulative tactics that constitute devices, schemes, and artifices to defraud.

254.    Attached as **Exhibit I** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS FRAUDULENT DEVICES.

255.    Defendant made untrue statements of material facts or omitted to state material facts necessary to make statements not misleading in connection with the offer, sale, or purchase of securities.

256.    Defendant's manipulative activities created false impressions about market activity, supply and demand, and securities prices.

257.    Defendant engaged in acts, practices, or courses of business which operated as a fraud or deceit upon persons in connection with the offer, sale, or purchase of securities.

258.    Defendant's pattern of manipulative activities constituted a course of business operating as a fraud or deceit upon market participants, including plaintiff.

259.    Defendant's violations of Nevada securities law caused damages to plaintiff.

260.    Plaintiff suffered financial losses as a direct and proximate result of defendant's fraudulent and deceptive practices.

261.    Defendant employed devices, schemes, and  artifices to defraud in connection with the offer, sale, or purchase of securities, as the coordinated patterns of spoofing, layering, quote stuffing, tape painting, and sell dominance created deceptive market conditions across the analyzed sessions [Exhibits 1–20].

262.    Defendant engaged in spoofing, bid layering, wash trading, naked short

selling, quote stuffing, and other manipulative tactics that constitute devices, schemes, and artifices to defraud, as repeatedly documented in the rapid non-bona fide order placements, layered stacks, matched clusters, high short volume with delivery indicators, and rapid reloads in the trade tapes and Level II videos [Exhibits 1–20].

263.    Attached as **Exhibit I** are transactions that are SPECIFIC INSTANCES OF ALLEGATIONS FRAUDULENT DEVICES [Exhibits 1–20].

264.    Defendant made untrue statements of material facts or omitted to state material facts necessary to make statements not misleading in connection with the offer, sale, or purchase of securities, as the artificial order book depth and volume signals misrepresented true supply/demand in the reviewed recordings [Exhibits 1–20].

265.    Defendant's manipulative activities created false impressions about market activity, supply and demand, and securities prices, as evidenced by the illusory depth, inflated short volume, and pinned ranges despite retail buying in the June to December 2025 sessions [Exhibits 1–20].

266.    Defendant engaged in acts, practices, or courses of business which operated as a fraud or deceit upon persons in connection with the offer, sale, or purchase of securities, as the systematic suppression and deceptive quoting directly deceived market participants about fair pricing [Exhibits 1–20].

267.    Defendant's pattern of manipulative activities constituted a course of business operating as a fraud or deceit upon market participants, including plaintiff, as the recurring tactics across multiple months distorted valuation and liquidity

[Exhibits 1–20].

268.   Defendant's violations of Nevada securities law caused damages to plaintiff, as the fraudulent devices and deceptive practices led to trading at manipulated prices in the analyzed exhibits [Exhibits 1–20].

269.   Plaintiff suffered financial losses as a direct and proximate result of defendant's fraudulent and deceptive practices, as the suppressed price action and artificial conditions resulted in unfavorable executions across the sessions [Exhibits 1–20].

Conclusion

For the reasons as fully stated herein, PLAINTIFF respectfully requests the court to deny DEFENDANTS 12(b) Motion to Dismiss for the reasons as fully stated herein.

Dated: July 2, 2026                         Respectfully submitted

/s/  Marc Steven Applbaum
Marc Steven Applbam, Esq. SBN # 222511
Counsel for Plaintiff
Midway Law Firm APC
4275 Executive Square Suite 200
La Jolla, CA 92037
marc@midwaylawfirm.com

INDEX OF EXHIBITS

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | AABB — June 23, 2025 Trading Session | 40 |
| 2 | Analysis of AABB Trade Tape on June 24, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 45 |
| 3 | Analysis of AABB Trade Tape on July 1, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 53 |
| 4 | Analysis of AABB Trade Tape on July 10, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 60 |
| 5 | Analysis of AABB Trade Tape on July 15, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 66 |
| 6 | Analysis of AABB Trade Tape on July 18, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 73 |
| 7 | Analysis of AABB Trade Tape on July 23, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 79 |
| 8 | Analysis of AABB Trade Tape on July 29, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 85 |
| 9 | Analysis of AABB Trade Tape on August 25, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 91 |
| 10 | Analysis of AABB Trade Tape on September 29, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 99 |

| 11 | Analysis of AABB Trade Tape on December 1, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 106 |
|---|---|---|
| 12 | Analysis of AABB Trade Tape on December 2, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 114 |

| **EXHIBIT NO.** | **DESCRIPTION** | **PAGE** |
|---|---|---|
| 13 | Analysis of AABB Trade Tape on December 4, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 121 |
| 14 | Analysis of AABB Trade Tape on December 8, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 141 |
| 15 | Analysis of AABB Trade Tape on December 16, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 149 |
| 16 | Analysis of AABB Trade Tape on December 17, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 160 |
| 17 | Analysis of AABB Trade Tape on December 19, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 179 |
| 18 | Analysis of AABB Trade Tape on December 23, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 185 |
| 19 | Analysis of AABB Trade Tape on December 26, 2025: Focus on GTSM and NITE with Video Correlation and Manipulation Tactics | 193 |

| 20 | Overview Presentation: AABB Stock Trade Data Breakdown (June 24 – December 26, 2025) | 203 |